Filed 1/26/17

# IN THE SUPREME COURT OF CALIFORNIA

THE PEOPLE,

      Plaintiff and Respondent,

      v.

GRAYLAND WINBUSH,

      Defendant and Appellant.

)
)
)
)
)
)
)
)
)
)
_____)

S117489

Alameda County
Super. Ct. No. 128408B

Ten days after he was released from the California Youth Authority, defendant Grayland Winbush murdered a young woman in her home during a robbery. The victim was beaten, stabbed, and ultimately strangled to death while her boyfriend was out Christmas shopping. The jury convicted defendant of murder in the course of a robbery, with personal use of a deadly weapon.[1] It fixed the penalty at death. We affirm.

## I. BACKGROUND

A.   *Guilt Phase*

    1.   *Events Before the Murder*

In December 1995, 20-year-old Erika Beeson lived with 21-year-old Mario Botello in an Oakland apartment. The building had a security gate, and visitors had to be "buzzed in" to enter. Botello sold small amounts of marijuana, mostly to

---

[1]    Penal Code sections 187, 190.2, subdivision (a)(17)(A), and former section 12022, subdivision (b). All statutory references are to the Penal Code unless otherwise stated.

SEE CONCURRING OPINION

people he knew. He grew up in South Berkeley and had been childhood friends with Norman Patterson. He was 14 when he first met defendant.

Defendant was arrested at age 14 for driving a stolen car and spent the next four years in custody at the California Youth Authority (CYA).[2] On December 12, 1995, at the age of 19, he was released on parole subject to electronic monitoring. Defendant soon began contacting friends, including Patterson. By that time, Patterson's sister had married defendant's brother.

During the weeks before defendant's release, Patterson and Botello had spent time together. On December 20, about a week after defendant came home, Patterson took defendant to visit Botello's apartment. Botello, Patterson, and defendant spent the visit talking and smoking marijuana. Beeson was home but did not join the conversation. At one point, defendant noticed a shotgun in the room. He asked if Botello could get him a gun, explaining he wanted to rob some drug dealers. The conversation made Botello uncomfortable. He did not want to help defendant, who was acting aggressively. Botello gave defendant $40 and talked about helping him find a job, but defendant did not appear grateful. Defendant and Patterson left after about an hour.

During the next two days, defendant called Botello five or six times asking for help obtaining a large-caliber gun. Defendant said he wanted to rob some drug dealers in Hayward and asked if Botello knew others he could rob. In one conversation, defendant asked if Botello loved his girlfriend. Botello thought the question was odd but did not consider it a threat. He tried to put defendant off politely, hoping he would drop the subject of guns. Nevertheless, defendant insisted Botello find him a firearm by the end of the week.

December 22 was the day of the murder. Around noon or 1:00 p.m., Maceo Smith brought defendant to the house he shared with his girlfriend, Iva Mosely.

---

[2] CYA is now the Department of Corrections and Rehabilitation, Division of Juvenile Facilities. (Welf. & Inst. Code, § 1000.)

2

Smith had long known defendant but had not seen him in four years. Among other things, the two men discussed committing a robbery together later that night. They called Botello to ask about the gun and announced they would be at his apartment in about 20 minutes. Botello and Smith were close friends. Botello left home immediately, however, to avoid encountering defendant. He asked Beeson to say he would be back later.

After defendant and Smith left, Mosely called Beeson to warn her they were coming. The women were friends and had shared their view that defendant was "weird." Beeson was still speaking with Mosely when defendant and Smith arrived, around 3:00 p.m. They climbed over the security gate and knocked on the apartment door. Beeson opened the door a crack and told them Botello was not home.

Defendant was angry that Botello had left and suggested robbing Botello. Smith refused to participate. Later that evening, defendant called Smith repeatedly. Smith avoided the calls. He and Mosely went to a movie, returning home shortly after 9:00 p.m.

Various witnesses established the following timeline. Around 3:45 p.m., Botello went Christmas shopping with his friend Grace Sumisaki. He called Beeson between 5:00 and 6:00 p.m. Beeson also spoke to her mother around 6:00 p.m. Two other friends stopped by the apartment in the same time frame. Another friend tried calling Beeson around 8:00 or 9:00 that evening, but the line was busy.

Botello's uncle, Andrew Williams, called around 7:35 p.m. and spoke briefly to Beeson. Williams arrived at Beeson and Botello's apartment between 7:45 and 8:00 p.m. Another young man was ringing the security buzzer, but he soon left. Williams rang the buzzer for about 10 minutes. No one answered. He then went to a friend's house and called the apartment about 10 times between 8:15 and 9:15 p.m. Each time, the line was busy.

3

2. *The Murder*

Around 8:00 p.m., defendant and Patterson went to Botello's apartment, intending to rob him. Beeson buzzed them through the security gate and met them at the apartment door. Patterson said he wanted to buy some marijuana. Beeson hesitated when she saw defendant but then let them both inside.

Defendant told Patterson to put the couple's puppies in a bedroom. Patterson returned with Botello's shotgun and picked up some containers of marijuana lying nearby. Defendant searched the bedroom and took $300. Defendant became irritated because Beeson did not seem to be taking the robbery seriously. He removed his belt and forced Beeson to the floor. Both he and Patterson choked her. Beeson struggled throughout but remained conscious. After a few minutes, at defendant's direction, Patterson brought him a butcher knife from the kitchen. Defendant stabbed Beeson repeatedly in the face, shoulder, and neck. He and Patterson left immediately afterward. Defendant took the knife with him. Patterson drove to Aquatic Park in Berkeley, where defendant threw the knife in the lagoon.

Defendant and Patterson picked up Smith shortly after he returned home from the movies. The trio went out drinking. Smith noticed defendant now had money to spend.

3. *Investigation*

a. *Discovery of the Crime Scene*

Knowing her boyfriend would be out, Beeson invited two friends to come over. Jennifer Onweller called around 8:00 p.m. to tell Beeson that she and Amy Kekki were on their way. The line was busy, which worried Onweller because she knew Beeson had call waiting. After several tries, Onweller called the operator and confirmed the phone was off the hook.

Onweller and Kekki arrived at Beeson's apartment around 9:30 p.m. and found the security gate propped open. The apartment door was locked, and no one responded when they knocked. The lights and television were on, but the

4

television was tuned to a sports channel, which was unusual for Beeson. The bedroom door was shut, and they could not see Beeson or the dogs inside. Onweller and Kekki then walked around the corner to a park to see if Beeson had taken her dogs for a walk. Unsuccessful, they returned to the apartment, and Onweller began writing a note. As she did so, Botello arrived. He found the door locked and could hear the dogs barking. Not having a key with him, he removed a screen and opened a window to enter.

The apartment had been ransacked. Beeson lay on the living room floor, covered in blood. She was not breathing. A wadded-up strip of masking tape and pieces of a gold rope necklace lay on the floor near her. The robbers had left a roll of masking tape nearby on the floor. Onweller found the telephone, which had been knocked off the hook, and called 911. Botello spoke with the dispatcher. Sounding "frantic" and "terrified," Botello insisted an ambulance be sent immediately. Police and an ambulance arrived, but Beeson had expired.

An autopsy revealed Beeson died from "[a]sphyxiation due to strangulation and multiple stab wounds." She had multiple scrapes and bruises on her arms, legs, back, and face, including a bruise on her nose matching the size and shape of Botello's shotgun barrel. A ligature mark circling her neck could have been made by a belt. She also had nine stab wounds on her face and neck.

> b.     *Investigation and Arrests*

Botello's shotgun, some marijuana, a piece of stereo equipment, and $300 in cash had been stolen. Botello told police he suspected defendant, Smith, and Patterson were responsible.

On December 26, the police discovered that defendant's electronic monitoring ankle bracelet had been disabled from 7:04 p.m. on the night of the murder through Christmas Day. They conducted a brief parole search and adjusted defendant's bracelet but were not ready to question him about Beeson's murder. They did question Smith, however. Smith gave them an unusually precise, "minute-by-minute" alibi for the night of the murder. As the investigation

continued, a number of witnesses reported that defendant was bragging about the murder.

On April 4, 1996, defendant and an accomplice were arrested for robbing a gas station. Defendant initially gave the police two false names. Questioned about the murder, defendant admitted he had met Beeson twice at Botello's apartment but denied ever speaking with her. About a week after this interview, defendant pled guilty to the gas station robbery and remained in custody.

While defendant was in jail, Julia P. called the police anonymously to report that she had heard defendant telling his cousin about the murder. Julia knew defendant's cousin, Lakeisha Lovely, and Patterson's girlfriend, Latonya Wilson. According to the caller, defendant said he had broken off his ankle bracelet, then robbed and killed a young Caucasian girl in her home. When Julia heard "Mario's girlfriend" had been stabbed, she was confused about why defendant would have stabbed her since "he always [had] guns on him" now.

On the evening of April 30, 1996, Patterson robbed a gas station and was arrested early the next morning. On the ride to the police station, he asked the officer sitting next to him, "You all didn't come get me about a murder?" The officer responded, "Not unless you want to talk to me about one." They both laughed, and Patterson said, "Naw, I don't think so." In a search of Patterson's home, police recovered the shotgun and stereo equipment stolen from Botello's apartment.

c.    *Confessions of Defendant and Patterson*

At the police station, Patterson waived his *Miranda*[3] rights and eventually confessed to the robbery. Because the shotgun was found at his home, the police then took him to the homicide division. Patterson first claimed he had bought the shotgun from a "dope fiend" he knew as Gichi Dan. When questioned specifically

---

[3]    *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

6

about the Beeson murder several hours later, however, Patterson admitted his involvement.

Patterson told the police that defendant needed money and wanted to rob Botello. Patterson kept making excuses, but defendant bullied him into going along. After Beeson let them into the apartment, Patterson put the dogs in a back room. When he returned to the living room, defendant was on top of Beeson, choking her with his belt. Defendant continued to struggle with Beeson and ordered him to retrieve the shotgun and marijuana. At one point, defendant hit Beeson in the head with the shotgun barrel. Patterson initially said that defendant took a butcher knife from the kitchen but later admitted that he had retrieved the weapon. Patterson described how defendant assaulted Beeson but denied ever stabbing her himself. Afterward, defendant took the knife and told Patterson to drive him to Aquatic Park. There, defendant left the car and returned without the knife. Defendant wanted Patterson to keep the shotgun at his house because he feared a parole search of his own home. They drove to Maceo Smith's house, and defendant told Patterson not to worry because they would have an alibi. Patterson later heard that defendant was bragging about the killing.

Shortly after Patterson's statement, officers interviewed defendant. Defendant waived his *Miranda* rights and initially denied any involvement. He was confident and self-assured during the questioning. However, after police told him they had evidence against him, showed him pictures of Patterson in custody, and played the first five minutes of Patterson's taped confession, defendant admitted the crimes.[4] The police secretly recorded his initial statements, and defendant later gave a formal taped confession. He also admitted the murder in a recorded phone call to his mother.

---

[4] The circumstances and content of defendant's interview are discussed in detail in connection with his claim that the statements were coerced. (See Discussion, pt. A.3, *post*, at pp. 44-48.)

7

d.     *Other Events Before Trial*

About two weeks later, acting on an anonymous tip, the police interviewed county jail inmate Tyrone Freeman.  Freeman had shared a holding cell with defendant on May 8, 1996.  Defendant told Freeman that he was in jail on a murder charge and "might have partially confessed."  He said he and his brother-in-law "Nate" were committing a robbery but the girl was not cooperating.  After sending "Nate" to search the house, defendant said he pistol-whipped the girl, choked her with his belt, and finally stabbed her with a knife he saw lying on the counter.  Defendant said he planned to blame the whole crime on "Nate."  He would explain that he was tired when he talked to the police and did not remember confessing.

Patterson was released on bail in July 1997.  A little over a year later, in September 1998, Patterson called Julia P. and asked her to come out and smoke marijuana.  He said nothing about Julia's anonymous phone call to the police, and she did not think he was aware of it.  They drove to a park and Patterson asked, "Was that you on that tape?"  Scared, Julia denied making the call.  Patterson then demanded that Julia have oral sex and punched her in the face when she refused.  He beat her severely, knocking out two teeth, breaking her nose, and causing her eyes to swell shut.  He also choked her, saying "[t]hat was you on that tape," and threatening to kill her.  He said, "I'm going to do you just like we did that bitch."  The assault ended when witnesses heard Julia screaming.  In 1999, Patterson was convicted of several charges arising from the incident.

4.     *Trial*

Defendant and Patterson were tried together for murder with special circumstance allegations.  Emphasizing that no physical evidence linked them to the murder, the defense argued the prosecution's case was based entirely on street rumors and coerced confessions.

Defendant testified, denying any involvement.  He admitted he and Smith went to Botello's apartment the afternoon of the murder but denied going back

8

later. Defendant testified he left his grandmother's house around 7:00 p.m. and took a bus to his aunt's home in South Berkeley. Around 10:00 p.m., he and Patterson drank and smoked marijuana with Smith and another friend. Defendant claimed the police had coerced his confession. They threatened him with the death penalty, said they had his fingerprints on Botello's shotgun, and played him the entire recording of Patterson's statement. Defendant said he confessed because the officers told him it would help him avoid the death penalty. He obtained details of the crime from Patterson's statement and things the officers told him. Defendant explained that he lied on the phone call to his mother because the officers were standing nearby and he wanted to keep his deal to avoid the death penalty.

Codefendant Patterson also testified that he had nothing to do with Beeson's killing. He said he did not visit Botello's apartment on the night of the murder and did not see defendant until 10:15 or 10:30 p.m. Patterson claimed he gave a false confession because police officers had assaulted him and threatened the death penalty.

Defendant's aunt testified that defendant sometimes visited her home, but she could not recall the specific date or time of any visit. Botello's landlord testified that he saw a lot of traffic in and out of the apartment and suspected drug activity.

The jury returned guilty verdicts against both defendants on all charges and found the special circumstance allegations true.

B.      *Penalty Phase*

     1.      *Prosecution Evidence*

The prosecution presented victim impact testimony from Beeson's mother and sister.[5] Melitta Beeson shared memories of her daughter and described her

---

[5]      Because defendant challenges the admission of victim impact evidence, this evidence will be described in greater detail in connection with his claims. (See *post*, at pp. 65-67.)

9

close relationship with her father. Fred Beeson was "totally devastated" by the murder and died six months later. Lisa Beeson testified about her sister's memorial service and the family's difficulty coping with the murder. She also described her ritual of bringing flowers to the graves of her father and sister.

The prosecution offered evidence under section 190.3, factor (b) (factor (b)) of other instances in which defendant committed or threatened violence. Seven incidents predated the murder. They involved physical and sexual assaults on other youths and altercations with police and CYA staff members. These incidents are discussed in detail in connection with defendant's claim that the court erred in admitting acts he committed as a juvenile. (See *post*, at pp. 74-75.) Four incidents occurred between defendant's release from CYA in December 1995 and his robbery arrest in April 1996. The prosecution also presented evidence that defendant sexually assaulted Julia P. three times. Details about these incidents are discussed in connection with defendant's claims of error relating to her testimony. (See *post*, at pp. 69-74.) In addition, the gas station clerk who was robbed testified that defendant and his accomplice wore ski masks and threatened to shoot if she did not cooperate.

The prosecution also presented factor (b) evidence about several jail incidents. Twice while awaiting trial, defendant attacked a fellow inmate. On February 6, 1998, defendant slipped out of his restraints and charged an inmate boarding a prison bus. After a deputy forced defendant to back away, defendant told the inmate, "That is what you get for calling me PC."[6] Another time, defendant charged an inmate being escorted back to his cell. Defendant punched the inmate, wrestling him and two deputies to the floor. The inmate did not provoke the attack. He was in waist chains and "virtually defenseless" when

---

[6] "PC" is a derogatory term referring to the classification for pedophiles, informants, and prisoners with low status.

10

defendant charged him. Defendant defied commands to stop and continued the beating until subdued.

Defendant also attacked prison guards on several occasions. For example,[7] on March 1, 1997, defendant was in the shower during a lockdown and given two minutes to finish. After the water was turned off, he complained he needed more time and angrily refused to comply with the lockdown. When a deputy tried to take him to an isolation cell, defendant punched the deputy two or three times in the face, breaking his nose. On another occasion, defendant refused to cooperate with procedures for a security check. He punched a deputy in the face, breaking his glasses.

2.    *Defense Evidence*

A defense investigator testified about interviews with two prisoners who saw defendant's altercation with the deputy in the showers. Both said the deputy struck first. Although defendant was shivering, the deputy threatened to send him to the "cold room," then began hitting him and spraying him with pepper spray. The prisoners said defendant was not combative but was simply asking to rinse off.

In addition, the defense offered expert testimony from Jamie Candelaria-Greene, Ph.D., that defendant suffered from learning disabilities and attention deficit hyperactivity disorder (ADHD). On cross-examination, she conceded defendant had been diagnosed with a conduct disorder and met the diagnostic criteria for antisocial personality disorder.

The jury sentenced Patterson to life imprisonment without possibility of parole but sentenced defendant to death. Defendant's appeal is automatic. (§ 1239, subdivision (b).)

---

[7]    Additional incidents will be discussed in connection with defendant's claim that the court erred in admitting evidence of misconduct not involving actual or threatened violence. (See *post*, at pp. 77-82.)

11

## II. DISCUSSION

A.    *Pretrial Issues*

1.    *Pitchess Rulings*

The trial court ruled on several motions filed pursuant to *Pitchess v. Superior Court* (1974) 11 Cal.3d 531.

Defendant sought to discover any complaints against Sergeants Olivas and McKenna for incidents of aggression, use of excessive force, dishonesty, or improper interrogation tactics. Based on defendant's showing, the court reviewed the records for promises of leniency or other improper interrogation tactics. It found no discoverable information. The court also reviewed Oakland Police Department personnel files in response to Patterson's *Pitchess* motion and found no discoverable information about inappropriate interview tactics. The defense received the officers' training records but no additional discovery through *Pitchess* proceedings.

Defendant also sought *Pitchess* discovery on four CYA officers and seven Alameda County Sheriff's deputies. After litigation over the required foundation, the court reviewed all but two of the files.[8] The court ordered release of nearly all of the CYA files, subject to a limited protective order. It also ordered discovery of some sheriff's department records, including the dates of incidents and names and addresses of individuals involved.

When a defendant shows good cause for the discovery of information in an officer's personnel records, the trial court must examine the records in camera to determine if any information should be disclosed. (Evid. Code, § 1045; *People v. Mooc* (2001) 26 Cal.4th 1216, 1226.) The court may not disclose complaints over five years old, conclusions drawn during an investigation, or facts so remote or irrelevant that their disclosure would be of little benefit. (Evid. Code, § 1045,

---

[8]    The court found insufficient cause to review the records of two sheriff's deputies. Defendant has not challenged this ruling on appeal.

12

subd. (b); *Mooc*, at pp. 1226-1227, 1232.)  *Pitchess* rulings are reviewed for abuse of discretion.  (*People v. Jackson* (1996) 13 Cal.4th 1164, 1220.)

The record includes five large volumes of sealed documents pertaining to all of defendant's motions.  The trial court made a detailed record of all the materials it found discoverable.  Our review confirms that all discoverable materials were properly released.  There was no *Pitchess* error.

2.      *Jury Selection Issues*

a.      *Cause Challenge Rulings*

Defendant contends the court erred in denying two of his challenges for cause and in granting one prosecution challenge without adequate voir dire.  Each challenge involved the panelist's personal views on the death penalty.

A cause challenge lies only if a panelist's death penalty views "would ' "prevent or substantially impair" ' the performance of the juror's duties as defined by the court's instructions and the juror's oath."  (*People v. Cunningham* (2001) 25 Cal.4th 926, 975; see *Wainwright v. Witt* (1985) 469 U.S. 412, 424; *Witherspoon v. Illinois* (1968) 391 U.S. 510, 521-522.)  "If a juror's responses are conflicting or equivocal, the trial court's ruling is binding on us.  [Citations.]  If not, we will uphold the trial court if the ruling is fairly supported by substantial evidence in the record, giving deference to the trial court which had the opportunity to observe and listen to the juror.  [Citations.]"  (*People v. Holt* (1997) 15 Cal.4th 619, 651.)  Defendant's first two claims were not preserved for appeal. The record amply supports the court's ruling on the third.

i.      *Denial of Defense Challenges*

Defendant unsuccessfully challenged two prospective jurors for cause.  He argued Prospective Juror E.T. was not qualified to serve because voir dire responses indicated he would vote for the death penalty in any case involving an intentional killing during a robbery.  Defendant raised a different challenge to Prospective Juror G.M.  He maintained G.M. could not be fair because, as a young

13

White woman similar in appearance to Beeson, she would identify too closely with the murder victim. The court denied both challenges.

Weeks later, voir dire concluded and actual selection began. Prospective Juror E.T. was seated early in the process. Neither side exercised a peremptory challenge, and he served as Juror No. 12. Several panelists cycled through the No. 9 seat. Eventually, Prospective Juror G.M. was seated in this position. Immediately afterward, the prosecution and defense declined to exercise any further peremptory challenges. Patterson's attorney declared, "The defense is very satisfied with the jury." As a result, Prospective Juror G.M. served as Juror No. 9.

Defendant now complains the court erred in denying his cause challenges to Juror Nos. 9 and 12. To preserve such a claim, a defendant must exercise a peremptory challenge and remove the prospective juror in question, exhaust all available peremptory challenges, and express "dissatisfaction with the jury as presently constituted." (*People v. Mills* (2010) 48 Cal.4th 158, 186.) None of these requirements was satisfied.

Defendant did not peremptorily challenge either Juror No. 9 or No. 12, nor did he exhaust his challenges. Counsel for defendant and Patterson were given 30 challenges to exercise jointly in selecting the 12 trial jurors. When counsel accepted the jury panel as constituted, the defense had 25 challenges remaining. Indeed, the defense "passed," indicating its satisfaction with the panel, four times after Prospective Juror E.T. was seated. Finally, rather than expressing dissatisfaction, counsel assured the court the defense was "very satisfied" with the panel chosen.[9] The court confirmed this satisfaction was shared by both defendants, and confirmed again, during an in-chambers discussion, that all parties agreed the 12 jurors currently sitting would serve as the trial jury.

---

[9] Although it was Patterson's attorney who expressed this satisfaction, the defendants agreed to make joint decisions about peremptory challenges and jury selection. The court was initially reluctant to proceed in this fashion but was persuaded to do so by defendant's counsel.

These facts establish forfeiture. When defendant accepted the jury, he had sufficient challenges remaining to repopulate the panel twice over yet declined to excuse E.T. or G.M. Using additional challenges would not have depleted the venire. Such a large pool of qualified jurors remained after the panel was selected that the court decided to seat six alternate jurors and allowed 12 peremptory challenges per side in their selection. Counsel was well aware this decision would forfeit defendant's ability to dispute the rulings on appeal.[10]

Relying on *United States v. Martinez-Salazar* (2000) 528 U.S. 304, defendant contends his claim is preserved. He argues *Martinez-Salazar* allows criminal defendants to risk leaving a biased individual on the jury then bring a Sixth Amendment challenge on appeal. Defendant misreads the case. In *Martinez-Salazar*, the high court was interpreting *federal* law, specifically rule 24 of the Federal Rules of Criminal Procedure (18 U.S.C.), when it concluded a defendant need not excuse a prospective juror in order to preserve a claim of error in the denial of a cause challenge. (*Martinez-Salazar*, at pp. 314-315; see *People v. Hillhouse* (2002) 27 Cal.4th 469, 487.) That rule is not binding on the states. (See *Martinez–Salazar*, at pp. 313-314.) Indeed, the high court has held there is "nothing arbitrary or irrational" about a state law requirement that the defendant use peremptory challenges to cure a trial court's assertedly erroneous refusals to dismiss jurors for cause. (*Ross v. Oklahoma* (1988) 487 U.S. 81, 90.) Such a requirement reasonably "subordinates the absolute freedom to use a peremptory challenge as one wishes to the goal of empaneling an impartial jury." (*Ibid.*)

Accordingly, defendant's claims are not cognizable on appeal. (*People v. Thomas* (2012) 54 Cal.4th 908, 935; *People v. Hillhouse*, *supra*, 27 Cal.4th at

---

**10** Before jury selection, Patterson's attorney sought a ruling that all cause challenges would be deemed cognizable on appeal, even if the defense did not exhaust its peremptory challenges. The court denied the motion, noting such a ruling would be contrary to precedent of this court and the United States Supreme Court.

p. 487; *People v. Williams* (1997) 16 Cal.4th 635, 667.) We decline defendant's invitation to revisit these rules or find his failure to satisfy them was justified. (See *Thomas*, at p. 935.) Defendant's attempt to derive an alternative standard of forfeiture from *People v. Yeoman* (2003) 31 Cal.4th 93 and *People v. Boyette* (2002) 29 Cal.4th 381 is also unavailing. In those cases, the defendant used a peremptory challenge to excuse the objectionable juror and exhausted all challenges. (*Yeoman*, at p. 114; *Boyette*, at p. 416.) Defendant failed to do either.

ii.     *Excusal of Prospective Juror E.I.*

Next, defendant claims the court erred in excusing Prospective Juror E.I., both because voir dire was inadequate and because her views on the death penalty would not have substantially impaired her ability to serve.

E.I.'s questionnaire responses indicated she was "[m]oderately in favor" of the death penalty. She explained, "it is acceptable punishment for certain crimes but," because of the "heavy responsibility" in imposing it, the defendant "had better be guilty and the jury had better be sure." She said she had been opposed to capital punishment in college but "became for it again" after learning about some horrific crimes. She agreed that California should have a death penalty because "[s]ome crimes are so serious that there are no second chances for the person who committed them. Why spend huge amounts of money on imprisoning these people." Asked whether she would always vote for death if the victim was intentionally killed for the purpose of a robbery by defendants with substantial criminal histories, E.I. responded that an "intentional" killing warranted the death penalty but she did not agree it was "always" appropriate.

In voir dire, when asked if she could realistically consider both sentencing options, E.I. stated that, while both were possible, "it would have to be really, really aggravating circumstances for me to choose the death penalty over life in prison, because that is the most serious thing you can do." When the court probed further, E.I. said she probably would have voted for the death penalty in notorious cases involving serial murder or "incredibly violent" murders like decapitation.

16

The court responded with a general description of the facts here: "In this case the allegation is one person has been killed. There aren't a number of victims like the Yosemite case or Ted Bundy. One victim. [¶] There was no mutilation involved, such as cutting the head off of the victim, things of this nature. That did not occur. [¶] There was no sexual assault involved in the commission of the murder." Given these features of the case, the court asked whether the death penalty would be a realistic sentencing option for E.I. She responded, "It doesn't seem to be the kind of case where I would vote for the death penalty." The court indicated it was inclined to excuse the juror but allowed the attorneys to question her first.

The prosecutor added that the victim had been "involved in marijuana dealing" and described the murder as a kind of "drug deal gone bad," after which the victim was strangled, stabbed and robbed. E.I. responded that she had not heard anything about the case to make the death penalty a possible sentencing option. She noted, "I would have to hear something really different to make the people so incredibly dangerous and deranged that it would have to be death as opposed to life in prison." The murder of a single victim would have to be extremely violent for her to vote for the death penalty. In an effort to rehabilitate the juror, Patterson's attorney gave her more details about the case: The victim was a 20-year-old woman, and two men entered her apartment with the intention of robbing her. They did rob her, and also "stabbed her repeatedly" and "[c]hoked her with a belt and killed her." He stressed, "There is no question that it was an intentional murder." E.I. said she would not automatically find the death penalty appropriate for an intentional killing, nor would she automatically vote for life imprisonment without parole in all cases not involving serial murder. She stated, "I do believe in the death penalty in most cases, but for the most part, life in prison will handle it." When asked about hypothetical cases, E.I. stated, "I can't say that I absolutely wouldn't, wouldn't vote for the death penalty. But, you know, I—it would definitely have to really be some reason for me to do that."

17

After a brief chambers conference, defendant's attorney examined E.I. He explained in some detail that penalty would be decided after a second trial in which the parties presented aggravating and mitigating evidence. Following this lengthy explanation, counsel said, "All I'm asking you, [is] would you wait and listen to the evidence in the second phase, and can you conceive that depending on what the aggravation is that you might return a verdict of death?" E.I. responded, "I don't want to send anybody to death." Counsel asked if she was saying she would not vote for death. She said, "I'm beginning to think more and more—as I'm more and more on the spot, I don't want to live with my conscience." When counsel asked again, "Are you telling me that you would not want to return a verdict of death," E.I. answered, "No."

The court dismissed E.I. for cause, remarking it had formed a "definite impression" from the courtroom voir dire that E.I.'s views on capital punishment would substantially impair her ability to serve. E.I. clearly described the types of cases in which she would consider voting for death, i.e., those involving multiple killings or mutilation, circumstances not present in this case. Moreover, it appeared that, over the course of her questioning, E.I.'s views had become "crystalized that she could never return a verdict of death."

"A prospective juror may be excluded for cause without compromising a defendant's right to trial by an impartial jury if the juror's views on capital punishment 'would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." ' (*Wainwright v. Witt*, *supra*, 469 U.S. at p. 424; [citation].)"[11] (*People v. Virgil* (2011) 51 Cal.4th 1210, 1243.) " 'Generally, the qualifications of jurors challenged for cause are matters within the wide discretion of the trial court, seldom disturbed on appeal. [Citations.] There is no requirement that a prospective juror's bias against the

---

[11]     Citing no governing authority, defendant argues the familiar *Wainwright v. Witt* standard is "inconsistent with modern Sixth Amendment jurisprudence." We decline defendant's invitation to ignore this long-standing binding precedent.

18

death penalty be proven with unmistakable clarity. [Citations.] Rather, it is sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror. [Citations.] "On review, if the juror's statements are equivocal or conflicting, the trial court's determination of the juror's state of mind is binding. If there is no inconsistency, we will uphold the court's ruling if it is supported by substantial evidence. [Citations.]" [Citation.]' [Citation.]" (*Virgil*, at pp. 1243-1244.)**12**

The record supports the conclusion that E.I.'s finally expressed views made her unqualified to serve. "A prospective juror is properly excluded if he or she is unable to conscientiously consider all of the sentencing alternatives, including the death penalty where appropriate. [Citations.]" (*People v. Jones* (2003) 29 Cal.4th 1229, 1246.) Defendant complains the court ignored questionnaire responses showing support for the death penalty in favor of E.I.'s ambiguous statements in voir dire that did not clearly show she was unqualified to serve. Defendant mischaracterizes the record and misconstrues our standard of review.

Even if a prospective juror's questionnaire responses express a willingness to consider the death penalty, an excusal for cause is appropriate if oral questioning establishes that the juror's views on capital punishment would, in fact, substantially impair her ability to return a death sentence. (See, e.g., *People v. Virgil*, *supra*, 51 Cal.4th at p. 1244.) Here, E.I.'s questionnaire responses showed moderate support for capital punishment, noting it was appropriate for "some crimes." However, she clarified her beliefs during voir dire, consistently expressing the view that only the most violent kinds of killings warrant death. Defendant characterizes these responses as ambiguous because E.I. left room for

---

**12**    Defendant argues this deference is inconsistent with *Gray v. Mississippi* (1987) 481 U.S. 648 and *Adams v. Texas* (1980) 448 U.S. 38. As defendant notes, we have rejected this argument before. (See *People v. Schmeck* (2005) 37 Cal.4th 240, 263.)

the possibility that she could vote for death. However, in each instance, she emphasized that the murder would have to be particularly brutal. " 'The real question is " ' "whether the juror's views about capital punishment would prevent or impair the juror's ability to return a verdict of death *in the case before the juror*." ' " ' [Citations.]" (*People v. Cash* (2002) 28 Cal.4th 703, 719-720.) When E.I. was given a general outline of the facts, she candidly admitted it did not sound like the kind of case in which she could vote for the death penalty.

Defendant now complains the court and prosecutor gave the juror a sanitized, "sugarcoat[ed]" version of the incident. Yet, two defense lawyers expanded on those descriptions and on the process for determining penalty. Patterson's attorney stressed that the victim was only 20 years old and was killed in her own apartment by two men who intended to rob her. They choked and stabbed her repeatedly in what he stressed was unquestionably an intentional killing. With that preface, he asked whether such a murder could be sufficient to support a death verdict. Once again, E.I. hedged in responding, stating only that an intentional killing would "sort of ma[ke] that more of a possibility," but consistently emphasized that she would be able to vote for death only in extreme cases.

We determined similar views supported a removal for cause in a previous death penalty case involving the same trial judge. (*People v. Martinez* (2009) 47 Cal.4th 399.)[13] In *Martinez*, a prospective juror stated that a crime would have to be " 'particularly heinous' " or involve other circumstances like recidivism to warrant the death penalty. (*Id*. at p. 428.) The prospective juror in *Martinez* conceded there was a possibility she could vote for death, depending on the facts, but " 'it would have to be something that would push me beyond the way I normally feel about the death penalty.' " (*Id*. at p. 429.) We concluded these

---

**13** We repeatedly commented on the careful and thoughtful voir dire Judge Horner conducted in *Martinez*. (*People v. Martinez*, *supra*, 47 Cal.4th at pp. 433, 437.) The thoroughness of his voir dire in this case is similarly commendable.

20

statements reserving the possibility of a death verdict did not necessarily mean the juror was qualified: "The trial court was justified in concluding that the prospective juror's responses, rather than suggesting she could set aside her own personal views, constituted merely a grudging acknowledgment that those views might include some narrow exception—or at least an abstract possibility she would consider the statutory penalty of death. But the mere theoretical possibility that a prospective juror might be able to reach a verdict of death in some case does not necessarily render the dismissal of the juror an abuse of discretion. [Citations.] Excusal for cause is not limited to a juror who ' "zealously opposes or supports the death penalty in every case." ' [Citation.]" (*Id.* at p. 432.) Echoing the dissent in *Martinez*, defendant argues the dismissal was improper because E.I. was not asked whether serial killings and murders involving mutilation were the *only* types of cases in which she could consider the death penalty. (See *id.* at p. 461 (conc. & dis. opn. of Moreno, J.).) However, a court is certainly capable of discerning bias without hearing a prospective juror's speculation about all the potential circumstances that might support death. E.I. did not limit her discussion to serial killings or mutilations but consistently made clear that, in her view, only an especially violent murder could warrant punishment by death.

Defendant also complains the court did not allow adequate voir dire because it prevented defense counsel from telling E.I. about aggravating evidence that would likely be introduced at the penalty phase. We have repeatedly cautioned that death-qualification voir dire "must not be so abstract that it fails to identify jurors whose death penalty views would prevent or substantially impair their performance as jurors" but also "must not be so specific as to require prejudgment based on a summary of potential [aggravating and mitigating] evidence. (*People v. Cash*[, *supra*,] 28 Cal.4th [at pp.] 721-722.)" (*People v.*

*Leon* (2015) 61 Cal.4th 569, 586.)[14] The trial court has considerable discretion in striking this balance. (*Leon*, at p. 586; *People v. Cash, supra,* 28 Cal.4th at p. 722.) The ruling here was well within that ample scope. The attorneys had already given E.I. a detailed preview of how and why the murder was committed. The court reasonably concluded that voir dire questions describing particular evidence likely to be offered in aggravation would come too close to requiring E.I. to prejudge penalty. A defendant has no right to ask prospective jurors to predict how they would decide penalty based on a summary of aggravating or mitigating evidence. (*People v. Carasi* (2008) 44 Cal.4th 1263, 1326-1327 (*Carasi*); *People v. Burgener* (2003) 29 Cal.4th 833, 865.) In any event, the aggravating evidence here, which primarily consisted of violent outbursts while defendant was in custody, was not nearly as shocking as Beeson's murder. A description of this evidence would not have caused a reasonable juror to change her views about the appropriateness of death as a penalty.

Moreover, E.I.'s response to defense counsel's final questioning removed any doubt about her inability to serve. Defendant's attorney explained that if the case reached a penalty phase, the parties would present aggravating and mitigating evidence about the crime and the backgrounds of the offenders and the victim. He then asked whether E.I. could simply wait to hear that evidence and, if the aggravating evidence was appropriate, consider possibly returning a verdict of

---

**14** In supplemental briefing, defendant argues *People v. Leon* supports reversal because E.I.'s questionnaire responses indicated she could consider a death sentence, and she only changed her mind due to the prosecutor's "misleading" voir dire. What happened here is precisely the *opposite* of the situation that led to reversal in *Leon*. There, three jurors' questionnaires stated unequivocally that they could set aside their opinions about the death penalty and apply the law. (*People v. Leon*, *supra*, 61 Cal.4th at pp. 590-591.) Thus, they were presumptively qualified to serve. (*Id*. at p. 592.) Because the court's cursory voir dire was not sufficient to undermine this presumption, the record did not support their dismissal for cause. (*Id*. at pp. 592-593.) By contrast, the probing and thorough voir dire here amply supports E.I.'s dismissal.

death. E.I. responded that she had thought more about the issue and realized she could not live with her conscience if she sent anyone to death. She gave this answer when proceedings resumed after an in-chambers conference. As the court observed, E.I.'s views had apparently "crystalized" over the course of her questioning and perhaps during the break.[15]. Her candid admission that she could not vote for death under any circumstances revealed views that would " 'prevent or substantially impair' " her ability to perform as a capital juror. (*Wainwright v. Witt*, *supra*, 469 U.S. at p. 424.)

A refinement of views often occurs during voir dire. When panel members are sent to a courtroom, they learn for the first time that they have been called for a capital case. Then, appropriately, their opinions are probed in depth. These questions touch on matters of conscience, morality, social policy, and individual ability that panelists may never have considered in practical detail. The process encourages panelists to think deeply and seriously about their views. It falls to the discerning trial judge to carefully evaluate each panelist's state of mind on these weighty issues. The able trial court did so here. There was no error.

b.      Batson/Wheeler *Rulings*

Defendant, who is African-American, complains he was deprived of his constitutional rights to equal protection and a representative jury because the prosecutor exercised peremptory challenges to exclude African-Americans from

---

**15**      For this reason, defendant's reliance on *People v. Heard* (2003) 31 Cal.4th 946 and *People v. Pearson* (2012) 53 Cal.4th 306 is unavailing. In those cases, we determined cause dismissals were not supported by substantial evidence. One prospective juror's voir dire responses "indicated he was prepared to follow the law and had no predisposition one way or the other as to imposition of the death penalty." (*Heard*, at p. 967.) A second " 'had no strong feelings on the death penalty' " (*Pearson*, at p. 330) but was " 'positive' " she could vote to impose it in an appropriate case (*id.* at p. 331). These views stand in sharp contrast to E.I.'s predisposition to vote against death in all but the most egregious cases, and her ultimate conclusion that her conscience would prevent her from ever voting for death.

the jury.  (See *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).)

### i. *Background*

Because defendant makes several statistical arguments, we discuss the jury selection procedures in some detail.  The process, which the court conducted with meticulous attention, lasted from the middle of November 2002 until the beginning of March 2003.  Twelve panels of 90 individuals each were called and completed a 41-page questionnaire.  After some panelists were excused by stipulation or for hardship, the rest returned in small groups over several weeks for individual sequestered voir dire.  (See *Hovey v. Superior Court* (1980) 28 Cal.3d 1, 80.)  This process produced a pool of 73 qualified jurors:  49 Caucasians (67.12 percent); 10 Asian or Pacific Islanders (13.70 percent); four African-Americans (5.48 percent); three mixed-race[16] individuals (4.11 percent); four Hispanics (5.48 percent); and three (4.11 percent) whose race is not reflected in the questionnaires.

Jurors were called into the jury box in random order for the parties to exercise peremptory challenges.  Each side had 30 challenges, with 12 additional challenges to use for the alternates.  Defendant and Patterson agreed to exercise their challenges jointly.  The prosecutor exercised 10 peremptory challenges in selecting the trial jury and eight in selecting the alternates.  Three of these challenges were made against African-American panelists.  After each, the defense jointly asserted a *Batson/Wheeler* motion.  The court held a hearing and issued a detailed ruling denying the motions.

Including alternates, the jury was composed of 11 women and seven men, ranging in age from 24 to 61 years old.  All major cities in the county were represented except Fremont, Pleasanton, and Berkeley.  Thirteen of the jurors were Caucasian, three were Hispanic, and two were Asian.

---

[16]    These jurors identified as Puerto Rican/Hawaiian, Asian/Hispanic, and Caucasian/Latino.

## ii.    *Analysis of Individual Challenges*

Both state and federal Constitutions prohibit the use of peremptory challenges to remove prospective jurors based on their race or membership in a cognizable group.  (*Batson*, *supra*, 476 U.S. at p. 89; *Wheeler*, *supra*, 22 Cal.3d at pp. 276-277.)  A three-step inquiry governs the analysis of *Batson/Wheeler* claims.  "First, the trial court must determine whether the defendant has made a prima facie showing that the prosecutor exercised a peremptory challenge based on race.  Second, if the showing is made, the burden shifts to the prosecutor to demonstrate that the challenges were exercised for a race-neutral reason.  Third, the court determines whether the defendant has proven purposeful discrimination.  The ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.  [Citation.]"  (*People v. Lenix* (2008) 44 Cal.4th 602, 612-613; see also *Johnson v. California* (2005) 545 U.S. 162, 168.)

"A prima facie case of racial discrimination in the use of peremptory challenges is established if the totality of the relevant facts ' "gives rise to an inference of discriminatory purpose." ' [Citation.]"  (*People v. Scott* (2015) 61 Cal.4th 363, 384.)  At step two of the analysis, the prosecutor "must provide a ' "clear and reasonably specific" explanation of his "legitimate reasons" for exercising the challenges.' [Citation.]  'The justification need not support a challenge for cause, and even a "trivial" reason, if genuine and neutral, will suffice.' [Citation.]  A prospective juror may be excused based upon facial expressions, gestures, hunches, and even for arbitrary or idiosyncratic reasons."  (*People v. Lenix*, *supra*, 44 Cal.4th at p. 613.)  However, "race-based decisions are not constitutionally tolerable."  (*Id.* at p. 621; accord, *Rice v. Collins* (2006) 546 U.S. 333, 338.)

The People do not dispute the trial court's finding that a prima facie case had been established.  Accordingly, we focus on the third *Batson/Wheeler* prong and examine whether the African-American panelists were excused due to

25

intentional discrimination.  (See *People v. Mills*, *supra*, 48 Cal.4th at p. 174; *People v. Lenix*, *supra*, 44 Cal.4th at p. 613, fn. 8.)

"At the third stage of the *Wheeler/Batson* inquiry, 'the issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.'  (*Miller-El* [*v. Cockrell* (2003)] 537 U.S. [322,] 339.)"  (*People v. Lenix*, *supra*, 44 Cal.4th at p. 613, fn. omitted.)  Implausible or fantastic justifications offered at the second stage may not be sufficiently credible to pass muster at stage three.  (*Purkett v. Elem* (1995) 514 U.S. 765, 768.)  "In assessing credibility, the court draws upon its contemporaneous observations of the voir dire."  (*Lenix*, at p. 613.)  This assessment may also take into account "the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her.  (See *Wheeler*, *supra*, 22 Cal.3d at p. 281.)"  (*Lenix*, at p. 613.)

"We review a trial court's determination regarding the sufficiency of a prosecutor's justifications for exercising peremptory challenges ' "with great restraint." '  [Citation.]  We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses.  [Citation.]  So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.  [Citation.]"  (*People v. Burgener*, *supra*, 29 Cal.4th at p. 864.)

Here, in making its "sincere and reasoned" evaluation, the court carefully examined each of the prosecutor's explanations after independent review of the voir dire transcripts and its own notes about the jurors' demeanor.  (See *People v. Williams* (2013) 58 Cal.4th 197, 283-284.)  The court clearly understood its duty to scrutinize the prosecutor's reasons to distinguish bona fide reasons from sham

excuses contrived to hide discrimination. (See *People v. DeHoyos* (2013) 57 Cal.4th 79, 115.) It issued an unusually detailed, careful ruling, referring to specific portions of voir dire and citing numerous authorities. Accordingly, its decision is entitled to deference and must be upheld if it is supported by substantial evidence. (*People v. Lomax* (2010) 49 Cal.4th 530, 571; *People v. Lenix*, *supra*, 44 Cal.4th at p. 613.)

a)      *Prospective Juror E.T.*

The prosecutor used his second peremptory challenge to excuse Prospective Juror E.T., a retired credit manager from Oakland married to a retired federal immigration agent. She stated in the questionnaire that she had been arrested for obstruction of justice but did not explain her answer. During voir dire, she explained that she and a police officer "kind of got into a thing" when she was helping her sister leave her husband. She said the officer pushed her and "made some kind of remarks." She retaliated, and "[i]t escalated from that." She was arrested but the charges were dropped.

In the questionnaire, E.T. described her general opinion about the death penalty as neutral but also stated, "If you take a life be prepared to give up your life." In voir dire, she said she had "mixed feelings" about capital punishment. She explained that, according to the Bible, "only God is supposed to be able to really take somebody's life," and "[i]t's not our place" to kill someone; however, she also believed people shouldn't be allowed to murder others.

The prosecutor cited these mixed feelings about the death penalty as one reason for striking E.T. Another reason, related to the first, was a concern that E.T.'s religious beliefs would make it difficult for her to impose the death penalty. The prosecutor said it raised "a huge red flag" if a potential juror stated that only God can take a life. He explained that, "as a prosecutor in a death penalty case, every single juror that makes [that] answer [has to be excused] either by cause or by peremptory challenge or I'm not doing my job." He noted no one sitting on the jury had given such an answer.

27

The prosecutor also cited E.T.'s attitude toward law enforcement. Before voir dire, he had obtained the police report related to E.T.'s obstruction of justice charge. The report, which was provided to the defense, revealed a different kind of encounter than E.T. described. A uniformed police officer responded to a residence to serve a felony arrest warrant on a person inside. E.T. blocked his entry. Even after the officer physically moved her aside, E.T. continued to place herself in the officer's way until the subject of the warrant was able to escape. The prosecutor believed the incident showed E.T. was unfriendly toward law enforcement, and this attitude was especially problematic because the credibility of Oakland police officers would be a crucial issue in the case.

The prosecutor also observed that Patterson's attorney questioned E.T. only briefly and defendant's attorney asked no questions at all. Their approach raised the concern that E.T. would favor the defense.

The court found each of the prosecutor's reasons supported by the record and expressive of his true motives in excusing E.T. Substantial evidence supports these findings. E.T. expressed mixed feelings about capital punishment. A juror's reluctance to impose the death penalty has long been considered a legitimate, race-neutral basis for excusal in a capital case. (E.g., *People v. Lomax*, *supra*, 49 Cal.4th at p. 572; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1123; *People v. Pride* (1992) 3 Cal.4th 195, 230; *People v. Johnson* (1989) 47 Cal.3d 1194, 1222.) The trial court observed E.T.'s statement that only God can take a life expressed a "startling and dramatic" reservation about the death penalty based on what appeared to be the juror's strongly held religious beliefs. The court observed that no other juror had expressed such a strongly held view. We have repeatedly upheld peremptory challenges to jurors whose reservations about the death penalty are religious in nature. (E.g., *People v. Cash*, *supra*, 28 Cal.4th at p. 725; *People v. Catlin* (2001) 26 Cal.4th 81, 118-119; see *People v. Pearson* (2013) 56 Cal.4th 393, 422 [challenge to juror whose religious beliefs would make it " 'hard' " to impose the death penalty did not support a prima facie case of *Wheeler* error].)

28

The court found E.T.'s negative attitude toward law enforcement was an independent reason for the strike. After reading her arrest report for interfering with a police officer, the court concluded E.T. had committed substantial unlawful conduct, which she minimized during voir dire. A juror's prior arrest is an accepted race-neutral reason for peremptory challenge. (*People v. Lomax*, *supra*, 49 Cal.4th at p. 575.) For similar reasons, a juror's negative experience with law enforcement can also be a valid basis for exclusion. (*People v. Gutierrez*, *supra*, 28 Cal.4th at pp. 1124-1125; see *People v. Farnam* (2002) 28 Cal.4th 107, 138; *People v. Sanders* (1990) 51 Cal.3d 471, 500-501.)

Finally, the court noted that defense counsel's failure to question a juror was viewed as a valid race-neutral reason justifying the prosecutor's peremptory challenge in *People v. Ervin* (2000) 22 Cal.4th 48, 75. While this reason might not be sufficient in isolation to support a challenge, the absence of any significant questioning by defense counsel is relevant and may legitimately support a prosecutor's feeling that the panelist would favor the defense. (See *ibid*.)

b)      *Prospective Juror B.C.*

The prosecutor used his sixth peremptory challenge to excuse B.C., a 54-year-old receptionist from Oakland. B.C. disclosed in the questionnaire that her daughter had been raped two years earlier by a "high-profile" person who was not convicted. She favored strengthening the justice system to give victims justice. In voir dire, B.C. explained that her daughter's rapist was a professional basketball player. The case was investigated by the Alameda Police Department but was eventually "dropped."

B.C. had previously served as the foreperson in a criminal case. In her questionnaire, she stated that the case resulted in a verdict; however, in voir dire, she reported that the jury hung on one count. They found the defendant guilty of attempted robbery and being a felon in possession of a firearm but could not reach a verdict on an attempted murder charge.

29

B.C. also expressed the view that minorities are not treated fairly by the justice system, explaining that minorities were usually unable to pay for the same quality of legal representation available to White defendants. In voir dire, B.C. said she thought people who can afford a private attorney "have a better chance in court" than those represented by a public defender, citing the O.J. Simpson case as an example. Patterson's attorney then told B.C. that in addition to retained lawyers and public defenders, some defendants are represented by private lawyers who donate their time. The court remarked after B.C. left the courtroom that this colloquy was misleading. It appeared to give the juror the impression that these defense counsel were donating their time, which was not true. The court noted that the problem had only arisen with B.C. but admonished counsel, "Don't do that again."

The prosecutor gave several reasons for striking B.C. He mentioned her experience as the foreperson of a hung jury. He gave examples of other panelists he had excused specifically because they had served on hung juries. B.C. was the foreperson of a jury that could not agree on the most difficult charge, attempted murder. However, even though the jury hung on one count, B.C. found the experience satisfying and nonstressful. From these answers, the prosecutor deduced that, "rather than dig in[and] work her way through to a verdict, which would have been a more difficult thing to do," B.C. joined with other jurors and "agreed to take the easy way out[,] to simply agree not to agree." He noted that jurors here would be confronted with a difficult decision if the case reached a penalty phase, and he did not want someone on the jury who previously "took the easier way out" when she was leading deliberations. The prosecutor also feared B.C. would be elected foreperson, because of her experience in that role, "and when she was a foreperson before, she led the jury to a hang on the difficult charge."

The prosecutor also struck B.C. because of her views on the criminal justice system. She expressed concern in both the questionnaire and voir dire about the

quality of representation received by people who could not afford private lawyers. After this discussion, Patterson's attorney made comments that gave B.C. the clear impression that he was working on the case for free. The impression that defense counsel were working for free was damaging because B.C. seemed to have a "full-fledged belief that if an African-American defendant can't pay his lawyers in the way that O.J. did, [he's] not getting a fair shake." B.C.'s views on money in the criminal justice system were highlighted by her assertion that the police or district attorney's office failed to pursue charges against the professional basketball player who had raped her daughter. The prosecutor summarized: "So here's a juror who's been in this situation before as a foreperson, who was willing to take the easy way out of a hung jury on a difficult count, who has very strongly held views expressed in her questionnaire and her oral voir dire that money gets you good representation, and she has concerns about that in African-American context. . . . And then we have a defense attorney who stands up and misleads her, leaves her with the impression that he's working for free along with the other lawyers here. That's a race-neutral reason, your honor. That's a situation where that juror was poisoned."

The court found that these reasons reflected the truth of why the prosecutor excused B.C. Again, the court's careful findings are amply supported by the record.

The court found B.C.'s prior service as the foreperson of a criminal jury that hung on the most serious charge justified the use of a peremptory strike. As the court observed, many cases have held service on a hung jury to be an appropriate, race-neutral reason for excusing a juror, and this reason alone could have justified the excusal of B.C. (E.g., *People v. Taylor* (2010) 48 Cal.4th 574, 644; *People v. Ayala* (2000) 24 Cal.4th 243, 265-267; *People v. Farnam*, *supra*, 28 Cal.4th at p. 138.) Prior experience on a hung jury "constitutes a legitimate concern for the prosecution, which seeks a jury that can reach a unanimous verdict." (*People v. Turner* (1994) 8 Cal.4th 137, 170.)

31

The court found that B.C.'s views about the fairness of the criminal justice system were also a substantial reason justifying the strike. In many of her answers, B.C. expressed "real fears" that an indigent defendant would suffer a significant disadvantage and only people who can pay for private lawyers will receive a good defense. "A prospective juror's distrust of the criminal justice system is a race-neutral basis for excusal. (*People v. Turner*, *supra*, 8 Cal.4th at pp. 170-171.)" (*People v. Clark* (2011) 52 Cal.4th 856, 907; see *People v. Pride*, *supra*, 3 Cal.4th at p. 230.) Further, the court believed defense counsel's statements about private attorneys donating their time created the irrevocable impression that the defense lawyers in this case were working for free. The prosecutor was justifiably concerned that B.C. would feel sympathy for the defendants because she would believe they were not receiving adequate representation. Finally, the court observed that B.C.'s views on the disparity of representation available to the wealthy were probably reinforced by the fact that her daughter's rapist, a high-profile and presumably wealthy person, avoided prosecution. Skepticism about the fairness of the criminal justice system to indigents and racial minorities has also been recognized as a valid race-neutral ground for excusing a juror. (E.g., *People v. Vines* (2011) 51 Cal.4th 830, 850-852; *People v. Calvin* (2008) 159 Cal.App.4th 1377, 1386.)

c) *Prospective Juror T.W.*

Immediately after Prospective Juror T.W. was called into the jury box, the prosecutor used his tenth peremptory challenge to excuse him. T.W., a 57-year-old maintenance supervisor from Oakland, answered "yes" to questionnaire items asking if he knew anyone who had been investigated or charged with a crime or if anyone in his family had been arrested or convicted of a crime. When asked to explain these answers, however, he simply drew question marks. In response to a question about particular types of crimes that upset him, T.W. said, "Innocent people going to jail." He stated, "I think the system is unfair to Black[s]" when asked about the effectiveness of the criminal justice system and checked "no"

32

when asked if the system treats minorities fairly. Expounding on this answer, he wrote: "So much to say[.] The history of slavery go[es] to[o] deep in this country." Asked if he would like to see changes to the justice system, T.W. responded "no" and explained, "It [is] the people I want to see changed." T.W. said he was "neutral" on the death penalty and thought it appropriate in some cases. When asked if his views on the death penalty had changed, however, he answered "yes" and commented "because of the number of Black[s] on death row."

The trial court explored some of these responses during T.W.'s voir dire. Asked about his comment that innocent people are going to jail, T.W. said, "We seem to be hearing a lot of it lately" and recalled hearing that another state had released many prisoners from death row for this reason. He also mentioned he was upset by the Riders scandal, a highly publicized case involving allegations of serious misconduct by four Oakland police officers. He affirmed that he held a strong view "that African-Americans have not been and are not now being treated fairly" in the criminal justice system. When asked about his comment that it was "the people" in the justice system he wanted to see changed, he told the court, "Well, I guess I'm talking about White people," although he conceded that "probably a lot of Black people's minds are made up as well, and maybe they're not capable of making decisions based on facts." Asked to explain his comments about race and capital punishment, T.W. said Black people have not been treated fairly in the judicial system and are disproportionately represented on death row.

On the subject of whether he could vote to impose the death penalty on an African-American defendant, T.W. stated that sentencing someone to death would be "a very difficult decision" regardless of the defendant's race. He told the prosecutor that he could conceivably impose the death penalty for the murder of a single adult, but the facts would have to be "pretty heinous" and "ugly." He also said "it seem[ed] unlikely" that he could vote for death for two defendants if only one person had been murdered.

33

Finally, the prosecutor asked if T.W. himself had any experience with being arrested or taken to jail. He answered that around 20 years earlier, after having too much to drink, he was arrested during an altercation with a cab driver. Although the police took him to jail, T.W. stated that he had "probably" been treated appropriately. Neither of the attorneys conducting voir dire for the defense asked T.W. any questions.

After this voir dire, the prosecutor challenged T.W. for cause. In the questionnaire, which had been signed under penalty of perjury, T.W. stated that he had not been arrested for any crime and had never "visited or been incarcerated in, any jail, prison, or juvenile detention facility." The prosecutor argued T.W.'s prompt and detailed voir dire answers indicated he clearly remembered his previous arrest and trip to jail. His failure to disclose these facts in the questionnaire could not be attributed to faulty memory. The prosecutor was also "deeply concerned" about the juror's views on race. He remarked that T.W. was very candid about his view that African-Americans are treated unfairly in the criminal justice system and disproportionately placed on death row.

The court denied the cause challenge but said it was "not totally satisfied . . . that this man is a totally impartial juror." The court understood the prosecutor's concern about having T.W. on the jury, noting it would stretch credulity to assume that T.W.'s views on racism and African-Americans on death row would not enter into his deliberations and judgment. However, it could not conclude as a matter of law that T.W. was too biased to serve.

The prosecutor repeated these reasons in explaining why he used a peremptory challenge to excuse T.W. He noted the juror had markedly negative views about the police and had mentioned a recent scandal involving Oakland police officers in particular. Because T.W. said he thought the Oakland Police Department was "a whole lot better now than it had been" despite the egregious misconduct alleged in the case, the prosecutor concluded he held a negative view of the department. The prosecutor's case depended heavily on the credibility of

Oakland police officers, and he did not believe T.W. would fairly consider their testimony. Negative views about the Oakland police were also evident in T.W.'s description of his arrest. The prosecutor argued that T.W.'s failure to disclose this incident in the questionnaire reflected a lack of honesty that was an independent, race-neutral ground for excusal. The prosecutor also cited T.W.'s reluctance to impose the death penalty and his clear belief that the criminal justice system is racist. The prosecutor also observed that defense counsel did not ask the juror a single question, which suggested their belief that T.W. leaned heavily in their favor.

Before ruling on the *Batson/Wheeler* motion, the court reviewed the transcript of voir dire and the cause challenge hearing as well as its own notes about the juror. Remarking that perhaps the cause challenge should have been granted after all, the court concluded the prosecutor had ample reasons for striking T.W. and his race-neutral justifications were sincere. When a prospective juror's hostility to law enforcement and the criminal justice system is not sufficient to support a dismissal for cause, it may well justify a prosecutor's peremptory challenge. (See, e.g., *People v. Williams*, *supra*, 58 Cal.4th at p. 287.) The court noted T.W. had been arrested by the same police department that investigated the murder. T.W.'s own arrest was a valid race-neutral reason for excusal. (See *People v. Box* (2000) 23 Cal.4th 1153, 1186, 1189.) Moreover, the juror's failure to disclose his arrest in the questionnaire could reflect a lack of candor, a legitimate concern for the prosecutor. (See, e.g., *People v. DeHoyos*, *supra*, 57 Cal.4th at p. 114; *People v. Booker* (2011) 51 Cal.4th 141, 166-167; *People v. Ayala*, *supra*, 24 Cal.4th at p. 266.) T.W. also expressed a very low opinion of the Oakland Police Department. Even if T.W. truly believed the department had improved in recent years, the relevant events took place seven years earlier. Moreover, T.W. strongly believed that nonwhite defendants cannot receive a fair trial. A prospective juror's views that the criminal justice system is biased, and that the death penalty has been disproportionately imposed against minorities, can

validly support a peremptory strike. (*Williams*, at p. 285; *People v. Vines*, *supra*, 51 Cal.4th at pp. 850-851.) Based on this record, the trial court reasonably concluded T.W.'s mind was already made up against the prosecution.

### iii. *Comparative Analysis*

As part of our assessment of the court's factual findings, we also consider comparisons between African-American panelists the prosecutor challenged with panelists of other races who were allowed to serve. (*People v. DeHoyos*, *supra*, 57 Cal.4th at p. 103.) "The rationale for comparative juror analysis is that a side-by-side comparison of a prospective juror struck by the prosecutor with a prospective juror accepted by the prosecutor may provide relevant circumstantial evidence of purposeful discrimination by the prosecutor. [Citations.]" (*Id*. at p. 109.) "If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson*'s third step." (*Miller-El v. Dretke* (2005) 545 U.S. 231, 241.) "At the same time, 'we are mindful that comparative juror analysis on a cold appellate record has inherent limitations.' [Citation.] In addition to the difficulty of assessing tone, expression and gesture from the written transcript of voir dire, we attempt to keep in mind the fluid character of the jury selection process and the complexity of the balance involved. 'Two panelists might give a similar answer on a given point. Yet the risk posed by one panelist might be offset by other answers, behavior, attitudes or experiences that make one juror, on balance, more or less desirable. These realities, and the complexity of human nature, make a formulaic comparison of isolated responses an exceptionally poor medium to overturn a trial court's factual finding.' [Citation.]" (*People v. Taylor* (2009) 47 Cal.4th 850, 887.)

Defendant urges this court to conduct a comparative analysis of the excused panelists with all 18 of the seated trial jurors and alternates. However, defendant himself compares the excused panelists with only five of the trial jurors and one alternate. He makes no contention that comparison with any of the other 12 jurors

36

has probative value.  Accordingly, we limit our analysis to the six seated jurors defendant has specifically discussed.  (See *People v. Lomax*, *supra*, 49 Cal.4th at p. 572.)[17]

Defendant does not explicitly compare the excused panelists with jurors who were seated.  Rather, he argues two of the prosecutor's reasons for dismissing the panelists were pretextual because Caucasian jurors who expressed similar views were not excused.  Pretext is established, however, when the compared jurors have expressed "a substantially similar *combination* of responses," in all material respects, to the jurors excused.  (*People v. DeHoyos*, *supra*, 57 Cal.4th at p. 107, italics added.)  Although jurors need not be completely identical for a comparison to be probative (see *Miller-El v. Dretke*, *supra*, 545 U.S. at p. 247, fn. 6), "they must be materially similar in the respects significant to the prosecutor's stated basis for the challenge."  (*DeHoyos*, at p. 107.)

Defendant raised a comparative analysis argument in the trial court, and the prosecutor responded by explaining why he accepted some jurors who expressed beliefs similar to those he struck.  The trial court accepted the prosecutor's reasons, and we too conclude they do not support an inference of discriminatory motive.

Like B.C. and T.W., three seated jurors and one alternate expressed the view that the criminal justice system is unfair to minorities.  However, the prosecutor adequately explained why each of the seated jurors was stronger for the prosecution than those excused.

Juror No. 5, a Puerto Rican financial advisor, checked "no" on the questionnaire when asked if the criminal justice system treats minorities fairly and explained, "Empirical data has proven this fact."  However, based on this juror's demeanor and questionnaire responses, the prosecutor viewed him as "a

---

[17]     In any event, we have examined the responses of the remaining jurors and find nothing that casts doubt on the trial court's findings.

37

conservative person" with "strong beliefs in the need for people to take personal responsibility for their actions." The prosecutor explained that he accepted Juror No. 5 because of his strong support for the death penalty. For example, he stated that he would vote in favor of the death penalty on a ballot initiative because "[c]ertain crimes need to be dealt with [by] the death of the convicted." Even more important, when asked in voir dire whether death or a life sentence would be harder to impose, Juror No. 5 indicated they would be equally difficult. The prosecutor explained that in his experience, a juror who perceives either penalty to be a difficult choice is likely to be "very favorably disposed towards imposing the death penalty."[18]

Juror No. 6, a registered nurse, stated that the criminal justice system treats minorities fairly "not at all times, but usually." However, this juror had life experience the prosecutor reasonably believed would favor his side. Three years earlier, the 13-year-old niece of the juror's husband was murdered by a serial killer. The killer was then on death row in Texas. When asked about her views on the death penalty, Juror No. 6 said she knew that California had over 600 people on death row but had executed only three people in the past 10 years. She hoped the state would either start carrying out the sentences or change the law. Nonetheless, she viewed the death penalty as a strong symbolic statement that could hopefully deter similar crimes. The prosecutor described Juror No. 6's voir dire as "perhaps the most articulate recitation of a variety of kinds of reasons for voting for the death penalty as any juror [he had] ever come across." He found her to be "a remarkably strong juror" for the prosecution.

---

[18] Although the prosecutor justified his challenges to E.T. and T.W., in part, because the defense had failed to question them in voir dire, defense counsel also asked no questions of Juror No. 5. The prosecutor observed that Juror No. 5 was the only juror he had accepted whom defense counsel did not question. He believed Juror No. 5 leaned toward the prosecution, however, observing that he and the defense "probably have a pretty big disagreement about where that juror sits."

Juror No. 11 was a fire department captain. He placed an "x" on the questionnaire in between "yes" and "no" when asked if the justice system treats minorities fairly. He explained, "I have seen newspaper and news accounts that address this. I do believe that ethnicity is an issue in the criminal justice system. However, I have no strong personal opinion." The prosecutor recalled that he liked Juror No. 11 because he seemed focused on the issue of remorse. He stated in the questionnaire that the death penalty was appropriate only for cases involving extreme acts for which the defendant showed no remorse. Noting that both defendants had committed significant postmurder violence, including attempts to intimidate a witness, the prosecutor predicted he would "do pretty well on [the remorse] issue" with this juror. Also, like Juror No. 5, Juror No. 11 said in voir dire that both death and life imprisonment are severe penalties, and he would not have more difficulty imposing either one.

Some seated jurors also made statements similar to B.C.'s comments that money is necessary to buy a good defense. However, their sentiments on this issue were generally milder, or qualified. The prosecutor reasonably viewed them as stronger jurors for his side.

Juror No. 8 referred to the influence of wealth obliquely when she commented in the questionnaire that the O.J. Simpson trial had made her "somewhat skeptical" of the effectiveness of the criminal justice system. The prosecutor was impressed with her prior jury service in a murder trial, however. Juror No. 8 and one other juror believed the defendant was guilty of the greater offense, but the rest of the jury believed only the lesser offense had been proven. Aware that the verdict had to be unanimous, after much deliberation she and the other juror switched sides, convicting the defendant of the lesser offense. Juror No. 8 commented that they later learned, after talking with the judge, that they "had given the wrong verdict." From Juror No. 8's description of this experience, the prosecutor saw her as someone "who made great strides to reach a unanimous verdict." As for the fact that Juror No. 8 had talked herself into voting not guilty

on a murder charge, only to find out later that she had made a mistake, the prosecutor believed she would see this case as "an opportunity to redo her jury service" and would not make the same mistake again.

Juror No. 10, a supervisor of a grocery store meat department, stated in her questionnaire that the criminal justice system is "very effective if you have plenty of <u>money</u> & an <u>excellent</u> attorney." She also checked "yes" when asked whether minorities are treated unfairly in the criminal justice system. The prosecutor explained that he liked jurors who are supervisors because they often have to make hard decisions in their job. Because Juror No. 10 was a butcher, he felt she would not be overwhelmed by gory evidence in the case. The prosecutor also noted two ways in which Juror No. 10 shared similarities with victim Beeson: She had a history of drug abuse, and her husband had strangled her during an argument. In addition, when asked in the general portion of the questionnaire if she would like to see any changes to the criminal justice system, Juror No. 10 volunteered that she wanted to "narrow the appeals down on death penalty cases." She repeated in voir dire that if there was no doubt of a defendant's guilt, she did not see the need to spend money and court time on lengthy appeals. In light of these answers, the prosecutor believed she was a strong juror.

Like Juror No. 10, Alternate Juror No. 16 expressed doubts about the fairness of the justice system to minorities and the indigent. She stated in the questionnaire that the criminal justice system is "generally effective – but access (financially) to effective attorneys can be beneficial." When asked if minorities are fairly treated, she answered, "For the most part yes[,] but as in all aspects of life some people can be judged (unfairly) based on their race or ethnicity." The prosecutor did not recall details of Alternate Juror No. 16's questionnaire or voir dire except that she was strongly in favor of the death penalty and that her brother-in-law was a judge in Kern County. Although she circled the questionnaire response stating she was "moderately in favor" of the death penalty, rather than "strongly in favor," we do not agree with defendant's assertion that the prosecutor

40

mischaracterized the juror's views in a manner that evidences discriminatory pretext.  (See *Miller-El v. Dretke*, *supra*, 545 U.S. at pp. 244-246; *Cook v. LaMarque* (9th Cir. 2010) 593 F.3d 810, 818.)  Moreover, we find reasonable the prosecutor's reliance on the fact that Alternate Juror No. 16 was related to a sitting judge as an explanation for why the prosecutor chose not to challenge her.

The prosecutor gave reasonable explanations for why he viewed each of these seated jurors as more favorable than excused panelists E.T., B.C., and T.W. Comparative analysis does not suggest that the prosecutor's reasons for striking these panelists were pretexts for unlawful discrimination.

### iv.    *Statistical Arguments*

Apart from individual and comparative juror analyses designed to ferret out pretext, defendant insists discrimination must have occurred because it was statistically improbable that no African-Americans would serve on a jury in Alameda County.  He notes that while African-Americans comprised only about 6 percent of the panel, the prosecutor used 30 percent of his peremptory challenges against them, excusing 100 percent of the African-American panelists called into the jury box.

In regard to whether a prima facie case of discrimination has been established under *Batson*'s first step, we have observed that the excusal of all members of a particular group may suggest impropriety.  (*People v. Pearson*, *supra*, 56 Cal.4th at p. 422; *People v. Crittenden* (1994) 9 Cal.4th 83, 119.) Statistical evidence about the underrepresentation of certain groups in the venire may also be relevant to this prima facie showing.  (See *Johnson v. California*, *supra*, 545 U.S. at pp. 169-170 & fn. 5.)  Here, however, the trial court found a prima facie case had been established and proceeded to the second and third steps of the *Batson/Wheeler* inquiry.  The existence of a prima facie case is therefore not in dispute.  The *only* dispute here concerns whether the court properly found that the inference of discrimination was rebutted by the race-neutral justifications given for the strikes.  (See *Johnson*, at p. 168.)

41

We are aware of no case holding that statistical evidence about the underrepresentation of particular groups on a venire, or jury panel, can be sufficient to undermine a trial court's considered findings at the *third step* of a *Batson/Wheeler* analysis. By the third step, the court has already found that exclusion of jurors from a particular group requires explanation. (See *Johnson v. California*, *supra*, 545 U.S. at p. 173.) The question at the third step is not whether the defendant can plausibly urge systematic exclusion, but whether any particular panelist was, in fact, excused due to group bias. (See *People v. Avila* (2006) 38 Cal.4th 491, 549.) Defendant argues the Supreme Court's discussion of the percentage of African-American panel members struck in *Miller-El v. Dretke*, *supra*, 545 U.S. at pages 240 to 241, supports the relevance of statistics to third step inquiries. The high court did discuss these facts as relevant background. However, its conclusion that at least two panelists were dismissed because of manifest racial prejudice was not based solely on statistics but also on a close analysis of the voir dire responses of dismissed panelists and seated jurors, the use of racially discriminatory practices such as "shuffling" the jury panels, disparities in the prosecutor's questioning of African-American panelists, and a systemic policy of the district attorney's office to exclude African-Americans from juries. (*Id*. at pp. 241-264.) While statistical facts may retain some relevance at *Batson*'s third step as part of the universe of evidence bearing on the plausibility of asserted justifications for a strike (see *id*. at pp. 251-252), no case has suggested such facts alone could be sufficient to establish pretext.

Defendant complains that his jury consisted of eight Caucasians, two Asians and two Latinos, whereas, "if race were not an issue . . . one would have expected five white jurors, three Asian jurors, two Latinos, [and] *two blacks*." However, we have long held that "no litigant has the right to a jury that mirrors the demographic composition of the population, or necessarily includes members of his own group, or indeed is composed of any particular individuals." (*Wheeler*, *supra*, 22 Cal.3d at p. 277.) Nor does the Sixth Amendment demand such a

42

precise correlation between the demographics of the community and a particular jury. "Although a defendant has a right to a jury drawn from a fair cross-section of the community as a means of ensuring his or her right to an impartial jury, he or she has no right to a jury that reflects the racial composition of the community. [Citations.]" (*People v. Crittenden*, *supra*, 9 Cal.4th at pp. 119-120.) As the Supreme Court has explained, "[t]he Sixth Amendment requirement of a fair cross section on the venire is a means of assuring, not a *representative* jury (which the Constitution does not demand), but an *impartial* one (which it does)." (*Holland v. Illinois* (1990) 493 U.S. 474, 480.)

Finally, to the extent defendant's statistical arguments urge that the venire was not representative, the claim has not been preserved for appeal. Defendant neither objected to the panel nor moved to quash the venire. (See *People v. Lewis* (2001) 25 Cal.4th 610, 634.) Nor has he attempted to support the claim by showing that the jury selection process in Alameda County results in the systematic exclusion of African-Americans. (See *Duren v. Missouri* (1979) 439 U.S. 357, 364; *Lewis*, at pp. 634-635.)

3. *Admission of Defendant's Confessions*

Defendant sought to exclude his recorded statements about Beeson's murder. The confessions were made after full *Miranda* warnings (see *Miranda, supra,* 384 U.S. 436), but defendant argued they were involuntary because they were induced by "the intentional application of psychological pressure" and a promise of leniency to avoid the death penalty. After a lengthy hearing, the court found all of the statements admissible. Defendant renews his arguments, claiming reversible error. Substantial evidence supports the factual findings below. We independently conclude as a legal matter that the statements were voluntarily given.

a. *Background*

On May 1, 1996, police officers questioned Patterson about the murder after they found Botello's shotgun in his home. Patterson initially denied specific

43

knowledge but ultimately admitted his involvement and identified defendant as the murderer. The police then advised Patterson of his *Miranda* rights again and took a recorded statement. Patterson's interview concluded shortly before 1:00 a.m.

A day later, officers brought defendant to the police department. He was placed in a homicide interview room without handcuffs at 10:15 a.m. About an hour later, Sergeants Enoch Olivas and John McKenna began the interview. Defendant was immediately advised of his *Miranda* rights and waived them, both orally and in writing. The officers used no physical force during the interview and made no threats or promises to induce cooperation. Altogether, defendant spoke to the police from 11:07 a.m. until 2:00 a.m. the next morning, when he finished giving his final recorded statement about the crimes. This interview was conducted in relatively short sessions, with lengthy breaks between. Defendant was given food, drink, and access to a bathroom.

During the first session, defendant discussed how he knew Botello and Patterson. After 50 minutes of questioning, officers took an hour-long break and defendant had lunch. Questioning resumed for another hour and 15 minutes. Defendant talked more about Patterson and how he knew Maceo Smith. He speculated that a power outage at his grandmother's house was the reason his ankle monitoring bracelet did not transmit a signal during some days in December. At the end of the session, Sergeant Olivas said he had evidence that defendant was involved in Beeson's murder. He did not mention Patterson's interview or disclose other details. Defendant denied any involvement. The third interview session began after a 40-minute break and lasted a little over an hour. Defendant acknowledged visiting Botello's apartment and, contrary to his earlier statements, now admitted he had noticed Botello's shotgun. The officers brought defendant another meal during a 45-minute break.

The fourth interview session lasted about an hour and a half. Sergeant Olivas showed defendant photographs that depicted Patterson in custody and played the first four or five minutes of Patterson's taped confession. Olivas

44

testified that the portion he played did not include details about the murder, nor did he supply defendant with any details from Patterson's account about how the murder had been committed. Nevertheless, defendant's countenance changed noticeably. Whereas he had displayed confidence, smirking and saying the officers "didn't have anything on him," defendant now dropped his head. He mouthed, "that motherfucker," and said, "the streets made me bitter." After more questioning, defendant admitted he went to Botello's apartment to commit a robbery but said, "I didn't plan it the way it happened." He explained that Beeson "didn't take the robbery seriously." The officers took a 10-minute break.

When the interview resumed for another hour-long session, defendant made additional statements which Sergeant Olivas wrote down verbatim. Defendant said: " 'I admit I was there' "; " 'If I get the death penalty, I get it' "; " 'Once I got there, it all went sour' "; " 'I have to play it out' "; and " 'I'm fucked.' " Sergeants Olivas and McKenna both testified that they never mentioned the death penalty or any possible punishments. Defendant was the first to mention the penalty. His remark was unsolicited and not responsive. The officers did not acknowledge the remark or discuss penalties with defendant in any way. They took a 90-minute break after this session and set up equipment for the next interview session to be surreptitiously recorded. Sergeant Olivas believed defendant would soon start describing details about the murder, and he did not want to inhibit this disclosure by openly recording.

The next interview session began again shortly after 9:00 p.m. Before the questioning started, defendant remarked, " 'I'm going to get what I'm going to get.' " The officers then showed defendant photographs of Beeson and began recording. Defendant then confessed to robbing and murdering Beeson. He gave many details about the chronology, including what he and Patterson each did to Beeson, the items they stole, and how they disposed of the knife. Specifically, he said Patterson hit Beeson with the barrel of Botello's shotgun and she began making a lot of noise. Defendant gave his belt to Patterson and told him to choke

45

her into unconsciousness. When Patterson was unsuccessful, defendant grabbed an end of the belt, and they choked her together for several minutes. Because Beeson was still conscious and they worried about her making noise, defendant took a knife from the kitchen and stabbed her repeatedly in the shoulder and back of the neck. When they left, he thought Beeson was probably dead. Defendant was very animated in retelling the events, even acting out for the officers how he and Patterson had choked their victim and where on the neck he had stabbed her. At the end of this interview session, defendant said, "Man, I get this off my chest, man."

During a short break, the officers brought recording equipment into the interview room. Defendant waived his *Miranda* rights again and gave a formal taped statement. He again blamed Patterson for hitting Beeson with the shotgun and starting to choke her, but he admitted he grabbed the belt and choked Beeson also. Defendant also took full responsibility for the stabbing, although he said he only meant to quiet Beeson down so that he and Patterson could leave. When he realized the wounds could kill her, and it looked like she was suffering, defendant said he stabbed her one final time "[t]o finish it off." Sergeant Olivas testified that, throughout the interview, he never talked with defendant about the punishment for murder or circumstances that would implicate the death penalty.

After giving the recorded statement, defendant asked to call his mother. He was allowed to do so but was warned that all telephone calls were monitored. After the recording equipment was installed, defendant called and told his mother that he and Patterson had murdered a woman. He explained he had confessed to the police because he heard a taped statement in which Patterson was trying to minimize his own responsibility. Defendant said he told the police the truth because he thought they would seek the death penalty against him, whereas Patterson would get a reduced sentence. He thought he would probably spend the rest of his life in prison.

46

Later that night, defendant gave two more recorded statements to a deputy district attorney. The first described the robbery and murder in full detail. The second was an *Aranda* statement recounting the events of that evening without mention of Patterson's involvement.[19] Each of these statements was preceded by *Miranda* warnings followed by defendant's repeated waivers.

Defendant testified that he was not harmed or threatened during the interview, and his physical needs were provided for. The interview's tone was cordial and respectful at the start but turned accusatory when Sergeant McKenna showed him a photograph of Botello's shotgun. McKenna said defendant's fingerprints were found on the gun and the police had learned defendant was pressuring and threatening Botello before the murder. Defendant claimed McKenna said "I might as well help myself, defend myself right now, or else they would have to assume the worst and I would get the death penalty." The officers played him the entire tape of Patterson's confession. Afterward, defendant asked what could happen if he gave additional information. Sergeant McKenna responded that talking could help "clear" him of the death penalty if the murder was unintentional or accidental. Defendant testified that he changed his story because, with Patterson's statement and his fingerprints on the gun, the case against him appeared strong, and he did not want to risk the death penalty. He asked what would happen if he admitted more knowledge of the murder and said McKenna promised to call a friend at the district attorney's office. Then defendant "wouldn't have to worry about the death penalty if they [kept] their end of the bargain." Defendant believed the officers "had all the power" and could remove the case from death penalty consideration if he cooperated.

Sociology professor Richard Ofshe, Ph.D., testified as an expert on influence and police interrogation. Based on the interview tapes and transcripts and defendant's own recollection about unrecorded portions of the interview,

---

[19]     See *People v. Aranda* (1965) 63 Cal.2d 518.

Ofshe concluded the police used psychologically coercive tactics to secure defendant's confession. Specifically, in the professor's opinion, defendant's statements in the phone call to his mother indicated he believed he was avoiding the death penalty and securing a lighter sentence by admitting involvement. Although these statements did not prove capital punishment was threatened, they did suggest the subject came up during questioning. Ofshe also testified that defendant's confession was "contaminat[ed]" because it came after defendant heard the recording of Patterson's statement. He explained, "contamination can give someone information necessary to tell a story that fits the crime facts even if they weren't there." Ofshe discounted testimony that the tape was played for only five minutes because Patterson did not implicate defendant until later in his statement. Finally, Ofshe believed defendant's unpersuasive claim that the murder was accidental was an attempt to obtain leniency.

On cross-examination, Ofshe conceded that generally accepted procedure did not require the police to record all phases of defendant's interview. Encouraging defendant to feel angry with Patterson was not a psychologically coercive tactic. Nor was it inappropriate for the police to play defendant a portion of Patterson's recorded confession. Ofshe conceded the police did not appear to have used any psychologically coercive tactics during the recorded portions of defendant's interview.

After examining all relevant circumstances in a lengthy, thoughtful ruling, the court determined beyond a reasonable doubt that all of defendant's statements were voluntary. The court found both police officers credible based on the criteria set forth in CALJIC No. 2.20 and concluded both gave truthful accounts of defendant's interviews. Indeed, with regard to personal demeanor, the court observed that "one would be hard-pressed to find a more mild-mannered, in[]offensive, unantagonistic, soft-spoken, nonconfrontational, pleasant man than Sergeant Olivas." Nothing about the content of defendant's statements or his tone of voice on the recordings suggested he was speaking under physical or

48

psychological duress.  Nor did defendant say anything in the recordings to suggest that any deal had been offered regarding his penalty.  Based on the officers' unequivocal testimony and the absence of any contrary suggestion in defendant's recorded statements, the court found that no threats or deals had been made about the death penalty.  Defendant told his mother he believed he could avoid the death penalty by cooperating with the police, "telling them the truth," but he never attributed this belief to anything the officers said to him.  Defendant was extraordinarily experienced with the criminal justice system, had been interrogated by law enforcement and juvenile justice authorities many times before, and would not have been easily intimidated or coerced by the questioning here.  Finally, the court rejected Dr. Ofshe's testimony as heavily biased and based on unsupported hypothetical scenarios, such as death penalty threats made during a suspect's trips to the bathroom.  All of defendant's statements were admitted at trial.

> b. *Analysis*

State and federal constitutional principles prohibit a conviction based on an involuntary confession.  (*Lego v. Twomey* (1972) 404 U.S. 477, 483; *People v. Massie* (1998) 19 Cal.4th 550, 576.)  "The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citations.]  In determining whether a confession was voluntary, ' "[t]he question is whether defendant's choice to confess was not 'essentially free' because his [or her] will was overborne." ' [Citation.]"  (*People v. Carrington* (2009) 47 Cal.4th 145, 169.)  To be considered involuntary, a confession must have resulted from coercive police conduct rather than outside influences.  (*Colorado v. Connelly* (1986) 479 U.S. 157, 164-167.)

A confession's voluntariness depends upon the totality of the circumstances in which it was made.  (*People v. Carrington*, *supra*, 47 Cal.4th at p. 169; *Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226.)  Relevant factors include: " ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's

49

maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' " (*People v. Massie*, *supra*, 19 Cal.4th at p. 576.)  No single factor is dispositive.  (*People v. Williams* (2010) 49 Cal.4th 405, 436.)

Our standard of review is well established.  Voluntariness is a legal question subject to independent review; a trial court's related factual findings are upheld if supported by substantial evidence.  (*People v. Carrington*, *supra*, 47 Cal.4th at p. 169; *People v. Holloway* (2004) 33 Cal.4th 96, 114; *People v. Massie*, *supra*, 19 Cal.4th at p. 576.)  When the evidence conflicts, the reviewing court must accept the version of events most favorable to the People as long as it finds support in the record.  (*People v. Tully* (2012) 54 Cal.4th 952, 993; *People v. Thompson* (1990) 50 Cal.3d 134, 166.)

Defendant's primary argument is that police officers improperly coerced his confession by mentioning the death penalty and either explicitly or implicitly promising he would receive a lighter sentence if he confessed.  Although confessions procured by threats of prosecution for a capital crime have been held inadmissible (see *People v. Thompson*, *supra*, 50 Cal.3d at p. 169), mere "[r]eference to the death penalty does not necessarily render a statement involuntary." (*People v. Williams*, *supra*, 49 Cal.4th at p. 443.)  A constitutional violation arises "only where the confession results directly from the threat [capital] punishment will be imposed if the suspect is uncooperative, coupled with a 'promise [of] leniency in exchange for the suspect's cooperation' [citation]." (*People v. Holloway*, *supra*, 33 Cal.4th at p. 116.)

There was a square conflict in the evidence concerning whether defendant was threatened or promised leniency.  The court's resolution of this factual question rested heavily on credibility assessments.  Sergeants Olivas and McKenna both denied mentioning the death penalty or discussing the subject of punishment during defendant's interviews.  They testified that defendant made an unsolicited remark about the death penalty in an unrecorded session but that they did not respond or even acknowledge the remark.  Although defendant made

50

statements to his mother suggesting a belief he would not get the death penalty if he confessed, nothing in the transcript of the call, or elsewhere in the record, reveals the source of this misunderstanding. The trial court expressly found the officers' testimony credible. It found defendant's contrary account, and his expert's inferences based on that account, unbelievable. Substantial evidence supports these findings. We independently conclude defendant's statements were not coerced by express or implied promises of leniency. (See *People v. Tully*, *supra*, 54 Cal.4th at p. 993; *People v. Boyette*, *supra*, 29 Cal.4th at p. 412.)

This conclusion is not undermined by defendant's complaint that he was young and "had a limited educational background." Despite his youth, defendant had extensive experience with the criminal justice system, beginning in his early teens. He testified that he knew his *Miranda* rights. In his phone call to his mother he was even able to explain the difference between Three Strikes and indeterminate sentencing for murder. The record also belies defendant's claim that the police deceived him by claiming they had his fingerprints on Botello's shotgun, playing all of Patterson's taped confession, or suggesting that the murder was accidental. None of these assertions was corroborated. The trial court reasonably rejected defendant's testimony.

Defendant also now claims the length of his interrogation rendered it involuntary. Below, defendant expressly disclaimed any challenge based on deprivation of physical needs. Assuming he did not thereby forfeit his present complaint about interrogation conditions, the claim fails on the merits. Defendant misleadingly asserts that he was interrogated continuously for over 16 hours, punctuated only by psychologically coercive "periods of isolation." In fact, as defendant's trial counsel observed, defendant was in custody and interviewed for only about six hours before he confessed to murdering Beeson. The officers provided defendant with meals and access to the restroom. The questioning was interspersed with numerous breaks. Indeed, the trial court observed that the sessions between breaks were shorter than those at court. Although defendant was

51

left alone in the interview room, these relatively brief periods of solitude did not render the interview coercive, or the resulting statements involuntary. The police were under no obligation to provide defendant with entertainment or diversion. These periods gave him an opportunity to consider his situation, evaluate his options, and change his mind if he chose to do so. The trial court reasonably determined that the interview sessions were not unduly protracted and all of defendant's personal needs were appropriately met. There is no evidence the police " 'exploited any "slowly mounting fatigue" ' " to coerce a confession. (*People v. Williams*, *supra*, 49 Cal.4th at p. 446.) Defendant's claim of involuntariness on this ground fails as well.

The cases on which defendant relies are readily distinguishable. In *People v. Neal* (2003) 31 Cal.4th 63, 80-82, the police deliberately continued questioning after the defendant clearly and repeatedly invoked his right to counsel. This flagrant violation of *Miranda* weighed heavily in our conclusion that the interrogation was coercive. (*Neal*, at p. 81.) Neal was also jailed overnight between interviews without food, drink, or access to a toilet. (*Id*. at p. 84.) Here defendant's personal needs were accommodated and the officers carefully adhered to *Miranda*, obtaining multiple waivers. (Cf. *People v. Williams*, *supra*, 49 Cal.4th at pp. 447-448 [distinguishing *Neal* on these grounds].) *Taylor v. Maddox* (9th Cir. 2004) 366 F.3d 992 is neither binding nor apposite. In that habeas proceeding, the Ninth Circuit found a voluntariness determination unreasonable because state courts had ignored highly probative testimony supporting the defendant's account of his interrogation. (*Id*. at pp. 1005-1007.) The same cannot be said here; indeed, the trial court's careful examination of the evidence is especially notable. Spanning more than 57 pages of the reporter's transcript, the court's discussion covered all relevant evidence in extensive detail.

4.      *Denial of Severance*

Before trial, defendant moved to sever his case from Patterson's, arguing their antagonistic defenses would undermine verdict reliability and the

introduction of Patterson's statements would violate defendant's right of confrontation. In lengthy hearings, the court and counsel reviewed each line of Patterson's statement to the police and removed all references that arguably inculpated defendant. Having thoroughly and carefully redacted Patterson's statement, the court concluded its admission in a joint trial would not prejudice defendant.[20] The court ruled that defendant's claim of antagonistic defenses was insufficient for severance, citing numerous United States Supreme Court and California cases. (See, e.g., *Zafiro v. United States* (1993) 506 U.S. 534, 537-538; *People v. Jackson*, *supra*, 13 Cal.4th at p. 1208.)

Defendant renewed his motion for severance at various points during the trial when questioning or argument by Patterson's counsel suggested defendant bore primary responsibility. These motions were consistently denied. On appeal, defendant again claims he was prejudiced by Patterson's defense. He focuses on the testimony of two witnesses.

At the guilt phase, evidence was admitted that Julia P. anonymously called the police to report information about the murder. Julia told the police she had overheard defendant telling a cousin he had robbed Beeson, and people were saying defendant had either shot or stabbed Beeson when she refused to cooperate. A recording of this phone call was played at trial. The evidence was offered as proof of Patterson's motive for and consciousness of guilt in the assault. The court admonished the jury that it was being admitted against Patterson only. Nevertheless, defendant complains the evidence was not probative unless the jury found his confession to be true, and he argues the phone call would not have been admitted at all in a separate trial.

Defendant also complains Patterson "abandoned his defense of innocence" by offering the preliminary hearing testimony of Tyrone Freeman. Freeman had testified that, while they were in custody, defendant said he had murdered a girl

---

[20]    This issue became moot because Patterson ultimately testified.

during a robbery with his brother-in-law "Nate." The testimony implicated Patterson, who was romantically involved with defendant's sister. It also suggested defendant was responsible for the actual killing. Defendant now complains he was prejudiced because the prosecutor elected not to offer Freeman's testimony.

The Legislature has established a strong preference for joint trials. (*People v. Souza* (2012) 54 Cal.4th 90, 109.) Section 1098 states, in relevant part: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials." "Joint trials are favored because they 'promote [economy and] efficiency' and ' "serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts." ' (*Zafiro v. United States*[, *supra*,] 506 U.S. [at pp.] 537, [539].)" (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40 (*Coffman and Marlow*).) We review the denial of a severance motion for abuse of discretion, based on the facts as they appeared at the time of the court's ruling. (*Id*. at p. 41; *Souza*, at p. 109.) "Even if a trial court abuses its discretion in failing to grant severance, reversal is required only upon a showing that, to a reasonable probability, the defendant would have received a more favorable result in a separate trial. [Citation.]" (*Coffman and Marlow*, at p. 41.)

"When defendants are charged with having committed 'common crimes involving common events and victims,' as here, the court is presented with a ' "classic case" ' for a joint trial. (*People v. Keenan* (1988) 46 Cal.3d 478, 499-500.)" (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 40.) Defendant and Patterson were charged with Beeson's first degree murder and faced special circumstance allegations. The evidence against both was strong. Their common motivation to shift blame to each other did not by itself compel severance. (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 150 (*Letner and Tobin*); *People v. Jackson*, *supra*, 13 Cal.4th at p. 1208.) " 'If the fact of conflicting or antagonistic defenses *alone* required separate trials, it would negate the legislative

54

preference for joint trials and separate trials "would appear to be mandatory in almost every case." ' [Citation.]" (*Letner and Tobin*, at p. 150.) Instead, antagonistic defenses support severance "only where the acceptance of one party's defense precludes the other party's acquittal." (*Carasi*, *supra*, 44 Cal.4th at p. 1296; *Coffman and Marlow*, at p. 41.) If the moving party's guilt can be established by sufficient independent evidence, "it is not the conflict alone that demonstrates . . . guilt," and severance is not required. (*Coffman and Marlow*, at p. 41; see *Letner and Tobin*, at p. 150; *Carasi*, at p. 1298.)

Defendant's arguments for severance fail. The defenses he and Patterson offered at trial were largely consistent. Both testified that they were not present at the murder but were tricked into confessing. They each disavowed their own inculpatory statements. (See *Carasi*, *supra*, 44 Cal.4th at p. 1297.) Rather than undermining defendant, Patterson's testimony actually supported his claim that the police had coerced him into making a false confession. Indeed, it was defendant, not the prosecutor, who introduced Patterson's confession. Defendant relied on the tape to explain how he could have confessed to a murder he later claimed to know nothing about.

Even if the jury disbelieved their trial testimony and focused on the police statements, these versions were not sufficiently antagonistic to require severance. Defendant and Patterson each admitted to robbing Beeson, leaving her for dead, and disposing of the weapon. The only material inconsistency concerned the degree to which each participated in the murderous acts. " 'That each was involved in the incident was undisputed, however . . . . [T]his was not a case in which only one defendant could be guilty. The prosecution did not charge both and leave it to the defendants to convince the jury that the other was [the guilty] person.' " (*People v. Jackson*, *supra*, 13 Cal.4th at p. 1209.)

Significant independent evidence established defendant's guilt. As the trial court observed in denying his severance motion, "overwhelming" proof of defendant's guilt came from evidence "out of his own mouth." He confessed to

55

Beeson's murder repeatedly to the police, prosecutors, and his own mother. These confessions, coupled with testimony from others establishing motive and a timeline for the night of the murder, provided ample proof of defendant's guilt apart from Patterson's statements. Severance was not required. (*Letner and Tobin*, *supra*, 50 Cal.4th at p. 150; *Carasi*, *supra*, 44 Cal.4th at p. 1298.)

Defendant's complaints about specific evidence do not persuade us otherwise. Although Julia's phone call might not have been admitted in a separate trial, it was not admitted against *defendant* in this trial. The jury was admonished that the evidence was offered only against Patterson. We presume it followed this instruction. (See *Letner and Tobin*, *supra*, 50 Cal.4th at p. 152; *People v. Boyette*, *supra*, 29 Cal.4th at p. 436.) Nor does defendant have cause to complain about the admission of Tyrone Freeman's preliminary hearing testimony describing defendant's jailhouse confession. This evidence would have been admissible against defendant in a separate trial. The mere fact that damaging testimony is presented by codefendant's counsel instead of the prosecutor does not deprive a defendant of constitutional or statutory rights. (*People v. Jackson*, *supra*, 13 Cal.4th at p. 1208.)

Defendant's additional complaints of prejudice at the penalty phase are unpersuasive. Defendant complains he was denied his right to individualized sentencing because Patterson's counsel portrayed him as the more culpable party. However, this argument would eviscerate the statutory preference for joint trials in all capital cases. (See *People v. Hardy* (1992) 2 Cal.4th 86, 168.) There is no indication that the jury was unable or unwilling to assess penalty independently, or that it "engaged in improper comparative evaluations" of defendant and Patterson. (*People v. Taylor* (2001) 26 Cal.4th 1155, 1174.) The jury was told to decide the question of penalty separately as to each defendant, and we must presume it followed this instruction. (*Letner and Tobin*, *supra*, 50 Cal.4th at p. 152.)

56

B.  *Guilt Phase Issues*

      1.  *Admission of Victim Photographs*

Defendant sought to exclude several photographs taken at the crime scene and just before Beeson's autopsy.  He argued the crime scene photos were gruesome, because they showed a large amount of blood, and misleading, because the scene had been altered.  Paramedics had removed some of Beeson's clothing while attempting to revive her.  Defendant worried her seminude body would suggest a sexual component to the murder.  He also objected that photographs of Beeson's nude body on the autopsy table were unnecessarily graphic and largely cumulative of the pathologist's testimony.  The prosecutor argued the autopsy photographs were relevant to show Beeson had sustained bruising and other injuries all over her body, not just to her head and neck.  Photos of her blood-soaked clothing and of blood at the crime scene illustrated the brutality of the murder and contradicted defendant's self-serving statement that he had merely tried to put Beeson to sleep.  Although the paramedics' intervention had changed some aspects of the crime scene, the prosecutor maintained these photos were still relevant to corroborate testimony about the placement of Beeson's body and other items in the room.

The court weighed the probative value and risk of undue prejudice for each item offered, ultimately excluding four photographs.  Defendant now claims those admitted were unduly prejudicial under Evidence Code section 352 and their admission violated his federal constitutional rights to due process and a fair trial.

The admission of victim photographs lies within the broad discretion of the trial court.  Its decision will not be disturbed unless the photographs' probative value is clearly outweighed by their prejudicial effect.  (*People v. Heard*, *supra*, 31 Cal.4th at p. 975; *People v. Crittenden*, *supra*, 9 Cal.4th at pp. 133-134.)  The court carefully balanced probative value and potential prejudice for each photograph and admitted only those it found appropriate.  This decision was well within the court's discretion.  Proper admission vitiates defendant's constitutional

claim. (See *People v. Thomas*, *supra*, 54 Cal.4th at p. 935; *People v. Riggs* (2008) 44 Cal.4th 248, 304.)

Defendant's claim of prejudice rests largely on the fact that several photos depict Beeson's nude body. Crime scene photos with Beeson's shirt removed are misleading, he argues, and "subliminally" suggest a sexual aspect to the murder. Defendant contends this risk of undue prejudice was exacerbated by racial undertones: "A photograph of a naked, young white woman is the kind that tends to evoke an emotional bias against a defendant, particularly a young black man." The trial court properly determined any risk of prejudice was outweighed by the photographs' probative value.

The crime scene photos were the only ones depicting the location of Beeson's body in the room and her blood-soaked clothing. They corroborated the testimony of Botello and police witnesses and would help the jury understand and evaluate testimony about how Beeson was found. (See *People v. Pollock* (2004) 32 Cal.4th 1153, 1171.) Although unpleasant, they are not particularly gruesome or sexually graphic. Four of the photos show Beeson's body on its side, facing away from the camera. She is wearing only underwear and lying on a blood-soaked shirt with defibrillator pads attached to her chest. Two photos focus on the wounds to the back of her head and neck. These photographs were not so gruesome as to impermissibly sway the jury, which would hear testimony detailing all facts relating to the crime scene and victim. (See *People v. Scheid* (1997) 16 Cal.4th 1, 20.) Nor could nudity in the photos have misled the jury into thinking there was a sexual component to the murder. As the trial court observed, witnesses explained how medical interventions altered the original crime scene. Botello and the first police officer at the scene testified that Beeson was clothed when they found her. Witnesses repeatedly explained that her clothing had been removed by paramedics. Forensics experts confirmed there was no evidence of any sexual activity. Finally, the prosecutor assured the jury in opening statement

58

that "[t]here was no rape here," and defendant points to no questioning or argument raising that insinuation.

Nor were the autopsy photos impermissibly cumulative because there was no dispute about the cause of death. We have rejected this argument on many occasions. (See *People v. Riggs*, *supra*, 44 Cal.4th at p. 304; *People v. Scheid*, *supra*, 16 Cal.4th at p. 19; *People v. Crittenden*, *supra*, 9 Cal.4th at pp. 134-135.) The photographs were properly admitted to illustrate the testimony of the pathologist and to corroborate other evidence, including statements in both defendants' confessions. (See *People v. Thomas*, *supra*, 54 Cal.4th at p. 935; *Riggs*, at p. 304.)

2.      *Presence of Courtroom Deputy During Defendant's Testimony*

Defendant contends his federal due process rights were violated when the court stationed a deputy near the witness stand during his testimony. Any error was harmless.

When defendant testified at a pretrial hearing, a bailiff sat near the witness stand. Defendant's attorney observed that, while this arrangement was fine for the pretrial hearing, he would strongly object if a bailiff accompanied defendant to the stand during trial. Treating defendant differently from other witnesses in this way would communicate to the jury that defendant was especially dangerous. The court responded that its practice, like that of other judges in the county, was that "defendants with the charges we have before us" were accompanied to the witness stand by a bailiff. The court disagreed that the bailiff's presence communicated anything to the jury and noted that the bailiff was positioned about the same distance from defendant at the witness stand as he was when defendant was seated at counsel table. At a break, the court took measurements and moved the bailiff's chair farther from the witness stand to ensure that these distances would be identical. Having done so, the court ruled that it would "continue the practice of having any in-custody witness accompanied by a bailiff." He emphasized that this

rule would apply to any witness in custody, whether called by the prosecution or defense and regardless of the charge for which the witness was incarcerated. Both defendant and Patterson testified during the guilt phase and were the only in-custody witnesses to do so.

Decisions about courtroom security measures are typically reviewed for abuse of discretion unless they "carry an inordinate risk of infringing upon a criminal defendant's right to a fair trial." (*People v. Stevens* (2009) 47 Cal.4th 625, 632.) In *Stevens*, we held that stationing a deputy at the witness stand near a testifying defendant is not an "inherently prejudicial" practice that can only be justified by a showing of manifest need. (*Id*. at p. 638; see also *Holbrook v. Flynn* (1986) 475 U.S. 560, 567-569.) However, we also observed that "the trial court must exercise its own discretion in ordering such a procedure and may not simply defer to a generic policy." (*Stevens*, at p. 644.) We urged trial courts to give reasons on the record and explain why the need for this security measure outweighed potential prejudice to the defendant. (*Id*. at p. 642.) "Although not a model of clarity," the trial court's discussion there of safety concerns, the need to prevent distractions or escape, and juror notes expressing concern about the defendant's agitated demeanor, all indicated the court had exercised its own judgment based on case-specific considerations. (*Id*. at p. 643.)

The record was quite different in *People v. Hernandez* (2011) 51 Cal.4th 733. There, the trial "court asserted that it had seen a deputy at the witness stand 'in every trial I've ever done . . . because of security,' and noted that a bailiff was 'supposed' to sit behind 'all defendants' who testify, 'even in a petty theft' case. Despite a direct request from defense counsel, the court refused to make an individualized finding that defendant's behavior warranted this heightened security measure. Instead, the court responded that this defendant 'deserve [d]' to have a deputy stationed at the witness stand for the same basic security reasons 'every defendant deserve[d]' to have this procedure employed." (*Id*. at p. 743.) On the whole, these remarks revealed that the court ruled pursuant to a standard

60

policy and not based on specific facts about the defendant or the particular case. (*Ibid*.) The court briefly mentioned some specific factors, such as the defendant's extensive criminal record and the violent nature of his offense. However, its remarks were, at most, post hoc justifications for adhering to a generic policy. (*Ibid*.) This reliance on a standard policy was an abuse of discretion but reversal was not required because the error was harmless under *People v. Watson* (1956) 46 Cal.2d 818. (*Hernandez*, at pp. 744, 746.)

Here, the court devoted considerable time and attention to the issue. It discussed California cases addressing the use of physical restraints and other courtroom security measures and concluded the posting of deputies in the courtroom was within the court's broad discretion. It also obtained measurements and repositioned seating to ensure that the bailiff would not obstruct jurors' views of defendant and would sit the same distance away from him as when defendant was at counsel table. While the court's legal research and its careful measures to avoid prejudice are commendable, its analysis did not focus on case-specific reasons justifying the security measure.[21] On the contrary, the court emphasized that its order for posting a bailiff at the witness stand applied to *any* in-custody witness called by either side. Although many facts could have justified the order, given the nature of the present crimes and defendant's long record of violence while in custody (see *post*, at pp. 74-77), we do not examine the record for such case-specific reasons when it is clear that the court's order was based on a standing practice. (See *People v. Hernandez, supra*, 51 Cal.4th at p. 744.)

However, the error was clearly harmless. Two or three bailiffs were stationed in the courtroom throughout the trial, and only one sat near defendant at the witness stand. As the trial court took pains to ensure, the deputy sat three feet away from defendant, maintaining precisely the same distance from the witness

---

[21] We note that the trial occurred in 2003, well before our decisions in *Stevens* and *Hernandez*.

61

chair as from defendant's usual position at counsel table. Nothing in the record suggests the bailiff treated defendant with anything other than courtesy and respect. (See *People v. Hernandez*, *supra*, 51 Cal.4th at p. 746.) Moreover, the evidence against defendant was strong, much of it coming from his own detailed statements to the police and his mother. Given the compelling evidence of guilt, it is not reasonably probable defendant would have obtained a more favorable result absent the error. (See *id*. at pp. 745-746, 748; *People v. Watson*, *supra*, 46 Cal.2d at p. 837.) Nor is there a reasonable possibility that this security measure affected the penalty phase verdict.[22]

C.    *Penalty Phase Issues*

1.    *Victim Impact Evidence*

Defendant raises several challenges to victim impact evidence. None has merit.

a.    *Background*

The prosecution and defense filed motions in connection with victim impact evidence. After a lengthy hearing, the court rejected defendant's argument that victim impact testimony be restricted to family members who were personally present at the murder or would foreseeably be affected by the crime. However, the court precluded testimony from two of Beeson's friends under Evidence Code section 352, finding it would likely be duplicative of other evidence.

The prosecution offered testimony from Beeson's mother and sister. Melitta Beeson described her daughter as loyal, fearless, and artistic, with an infectious sense of humor. Beeson struggled with a learning disability and

---

[22]    Defendant argues prejudice under *Chapman v. California* (1967) 386 U.S. 18, 23. However, the failure to state reasons for stationing a deputy at the witness stand is not a federal constitutional error, and *People v. Watson* furnishes the appropriate test for judging harmlessness. (See *People v. Hernandez*, *supra*, 51 Cal.4th at pp. 745-746.) In regard to the penalty phase, the error was also harmless under the "reasonable possibility" test. (See *People v. Brown* (1988) 46 Cal.3d 432, 447-448.)

attended many schools. She was a rebellious teenager who often drank and stayed out late; however, she had matured in the year before her death and was starting to plan for the future. Beeson was very close to her father. Fred Beeson received the call that she was dead, and he had to identify the body. He was "totally devastated" by the murder and died six months later.

Lisa Beeson was close to her younger sister. She had just finished her penultimate semester of law school at Tulane and was out of the country when she learned Beeson had been killed. She came home to parents who were profoundly affected. Her father was depressed but also obsessed with trying to discover what had happened. Lisa withdrew from law school and moved home. She arranged a memorial service for her sister that many people attended. She also arranged a cremation and went with her father to bury the remains. As they drove to the mortuary, Lisa saw her father in the backseat stroking the top of the box containing Beeson's ashes. Her father and sister were now buried next to each other. Lisa described making identical bouquets, tied together with a ribbon, and placing them on the graves each time she visited. The family no longer celebrated holidays or birthdays. Lisa remained angry and hurt over her sister's murder.

After reviewing numerous photographs and documents offered by the prosecution, the court excluded roughly half under Evidence Code section 352. It admitted a notebook containing 53 photographs taken throughout Beeson's life, a report card, a group of letters, and a Christmas list Beeson gave her mother shortly before the murder. During closing argument, the court allowed the prosecutor to play an 18-minute video montage displaying photographs of Beeson from the notebook, crime scene, and autopsy, and the audio confessions of defendant and Patterson. The soundtrack consisted of taped excerpts from Iva Mosely's police interview along with both defendants' confessions.

b.      *Analysis*

i.      *Attendance of Family Members at Trial*

Before addressing the substance of this evidence, defendant claims the court erred in permitting Beeson's sister and mother to both attend the guilt phase and testify as victim impact witnesses.  Defense counsel observed these family members silently crying at points during the trial and argued they should be excluded from the courtroom.  The court denied the request, noting that it had paid close attention to the audience and had observed nothing remotely prejudicial.  There had been no outbursts or vocal demonstrations, nor any other violations of courtroom decorum.

This ruling was an appropriate exercise of the court's discretion.  Immediate family members of a murder victim have the right to attend trial subject to "overriding interests," such as the defendant's right to a fair trial.  (§ 1102.6, subds. (b)(1), (c).)  A spectator's behavior is grounds for reversal only if it is " 'of such a character as to prejudice the defendant or influence the verdict,' " and the trial court has broad discretion in determining whether spectator conduct is prejudicial.  (*People v. Myles* (2012) 53 Cal.4th 1181, 1215; *People v. Lucero* (1988) 44 Cal.3d 1006, 1022.)  We found no error in *Myles* when a murder victim's wife nodded in agreement with prosecution witnesses, cried openly in court, and was consoled by support persons.  (*Myles*, at pp. 1215-1216.)  The modest displays of emotion here were even less likely to prejudice defendant's right to a fair trial.  The trial court closely observed the proceedings and was in the best position to evaluate the impact of family members' conduct on the jury.  (See *ibid*.)  We defer to its informed conclusion that silent tears from Beeson's mother and sister were not prejudicial.

Nor is there merit to defendant's unsupported claim that family members who observe the guilt phase of trial may not testify as victim impact witnesses.  His proposal would severely curtail family members' statutory right to attend trial and the scope of permissible victim impact evidence.  Preserving a fair trial for the

64

defendant does not require such an extreme limitation on the court's discretion and the universe of victim impact evidence.

ii.     *Volume and Content of Victim Impact Evidence*

Next, defendant raises several challenges to the victim impact evidence admitted. He argues the evidence was excessive and the content was so emotionally charged as to be a memorial service for the victim. He specifically objects to testimony about Beeson's funeral and family visits to her grave. Finally, he complains the victim impact evidence supported "an invidious comparison between the societal worth" of the deceased and defendant.

"Unless it invites a purely irrational response, evidence of the effect of a capital murder on the loved ones of the victim is relevant and admissible under section 190.3, factor (a), as a circumstance of the crime. [Citation.]" (*People v. Booker*, *supra*, 51 Cal.4th at p. 190.) Moreover, the federal Constitution prohibits victim impact evidence only if it is "so unduly prejudicial" as to render the trial "fundamentally unfair." (*Payne v. Tennessee* (1991) 501 U.S. 808, 825; see *People v. Pearson*, *supra*, 56 Cal.4th at pp. 466-467.)

This victim impact evidence was well within these guidelines and typical in both volume and content to evidence we have routinely deemed acceptable. (See, e.g., *People v. Pearson*, *supra*, 56 Cal.4th at p. 467; *People v. Kelly* (2007) 42 Cal.4th 763, 793.) Testimony from two family members is not excessive. (*People v. Booker*, *supra*, 51 Cal.4th at p. 194.) In *Pearson*, we upheld the admission of victim impact testimony from three family members and six close friends. (*Pearson*, at pp. 464-467.) In *People v. Brady* (2010) 50 Cal.4th 547, 573, 576-577, we concluded testimony from a slain police officer's four sisters, fiancée, two fellow officers, police chief, and treating physician was not unfairly excessive.

Defendant argues that, to be consistent with *Payne v. Tennessee*, victim impact evidence must be limited to testimony from a single witness describing the murder's effect on a family member who was present at or immediately after the crime, and these effects must have been known or reasonably apparent to the

defendant. He also contends events occurring years before or after the crime are not admissible in aggravation under section 190.3, factor (a). We have routinely rejected these claims (see, e.g., *People v. Tully*, *supra*, 54 Cal.4th at pp. 1031-1032; *People v. Zamudio* (2008) 43 Cal.4th 327, 364) and do so again. The People are entitled to present a complete history of the murder victim's life and may also present testimony from loved ones who, sometimes vividly, describe the impact of their loss. (*People v. Garcia* (2011) 52 Cal.4th 706, 751.)

Nor was the testimony here so emotional as to invite an irrational response. The witnesses appropriately described the person Beeson was and the traumatic impact of her death on the family. We have consistently observed that the emotional trauma suffered by close friends and relatives is a permissible subject of victim impact testimony. (E.g., *People v. Zamudio*, *supra*, 43 Cal.4th at p. 368; *People v. Boyette*, *supra*, 29 Cal.4th at p. 445.) Both witnesses testified to the devastating effect of the murder on Beeson's father, but neither speculated that the murder in some way caused his death. (See *People v. Booker*, *supra*, 51 Cal.4th at p. 193.) Lisa Beeson's testimony about her father stroking the box of her sister's ashes, and about her own visits to the gravesites, was poignant but not so emotional as to provoke an irrational juror response. "Emotional testimony is not necessarily inflammatory." (*People v. Brady*, *supra*, 50 Cal.4th at p. 575; see *Booker*, at p. 193.) Moreover, we have repeatedly held that evidence related to a murder victim's funeral is relevant and admissible. (See *People v. Garcia*, *supra*, 52 Cal.4th at p. 752; *Booker*, at pp. 192-193.)

Finally, defendant complains the victim impact evidence created a risk that the jury's penalty decision would be swayed by improper comparisons between his character and Beeson's. He asserts this risk is particularly acute in cross-racial crimes, where jurors are likely to empathize with a White victim. We rejected similar arguments in *People v. Kelly*, *supra*, 42 Cal.4th at page 799. Here, too, the claims lack merit. Nothing in the victim impact evidence or argument, or elsewhere in the record, even remotely encouraged the jury to consider race in

reaching a penalty verdict.  (See *ibid*.)  Defendant complains the prosecutor's closing argument expressly contrasted the backgrounds of Beeson and defendant. In fact, the prosecutor only fleetingly mentioned that defendant and Beeson were about the same age in the context of discussing defendant's criminal sophistication.  He remarked on the absence of defendant's family at the trial but did not invite the jury to compare this lack of involvement with Beeson's family. In fact, it was *defense counsel* who argued, "we have a clear contrast here" between "the loving support that Erika Beeson's family gave Erika" and defendant's family, who not only failed to come to court but failed to support him when he struggled with ADHD as a child.

iii. *Videotape Montage in Closing Argument*

During closing argument, the prosecutor played an 18-minute videotape depicting several photographs of Beeson throughout her life and, briefly, in death. The audio track consisted of recorded excerpts from Iva Mosley's interview and the defendants' police statements.  All of the visual and auditory material in the videotape had previously been admitted in evidence.  There was no accompanying music.  After watching the videotape and hearing arguments from counsel, the court ruled that it could be played as a demonstrative aid during closing argument but would not be admitted into evidence.

We have addressed the admissibility of victim impact videotapes frequently, cautioning that courts should not permit evidentiary presentations with overly dramatic or emotional elements, stirring music, or irrelevant images.  (E.g., *People v. Prince* (2007) 40 Cal.4th 1179, 1289; see also *People v. Sandoval* (2015) 62 Cal.4th 394, 440-442; *People v. Kelly*, *supra*, 42 Cal.4th at p. 798.) However, unlike many other videotapes we have considered, here every image and sound presented in the videotape had already been admitted in evidence.  The prosecutor did not seek to introduce new evidence through the videotape.  Instead, he used the content of admitted items of evidence to make his points as a matter of argument.  As in *People v. Bramit* (2009) 46 Cal.4th 1221, 1241, "the videotape

67

was simply 'a repackaging of the evidence' " and was a permissible exercise of advocacy.

Defendant complains that the juxtaposition of victim images with excerpts from the confessions was misleading or inflammatory. The trial court rejected these assertions. We have viewed the videotape and agree that the presentation was not prejudicial. In *People v. Wash* (1993) 6 Cal.4th 215, 256, the prosecutor displayed slides of the crime scene and victims during opening statement while simultaneously playing audio portions of the defendant's confession. Over defendant's objection that the presentation was inflammatory, we concluded the prosecutor had committed no misconduct because the slides and recordings were later admitted in evidence and their use as demonstrative aids during argument was appropriate. (*Id*. at pp. 256-257.) The same is true here. The jury had previously received all of the videotape's images and sounds during trial. While the juxtaposition of confessions with images of the murdered victim may have been evocative, the videotape contained no " 'irrelevant or inflammatory material' " that could have " 'divert[ed] the jury's attention from its proper role or invite[d] an irrational, purely subjective response.' " (*People v. Prince*, *supra*, 40 Cal.4th at pp. 1289-1290.) Moreover, because defense counsel were the last to present arguments, they were free to comment on the prosecutor's presentation or offer rebuttal.

2.      *Issues Related to Factor (b) Evidence*

Section 190.3, factor (b) permits the jury to consider a defendant's criminal activity involving the use, threat, or attempt to use force or violence in deciding whether to impose the death penalty or life imprisonment without parole. Defendant raises several challenges to the factor (b) evidence admitted in his penalty trial.

68

### a.    *Harassment of Julia P.*
#### i.    *Sufficiency of Evidence*

Before trial, the prosecutor moved to admit evidence that defendant had sexually assaulted Julia P.  In a tape-recorded statement, Julia alleged that defendant had exposed himself to her and requested oral sex, then displayed a gun and attempted to rape her.  The defense challenged the truth of these claims, noting Julia did not file a police report and had not mentioned the incident in multiple conversations with the police about defendant.  The court ruled the evidence admissible, noting the delayed report went to the weight of the evidence and could be explored on cross-examination.  In addition, while the alleged conduct was violent and threatening, the court ruled it was not so inflammatory as to require an additional hearing.

At the penalty phase, Julia described three incidents.  Once, when she was sitting under a hair dryer, defendant approached with his pants down.  He forcefully touched her breasts and neck, exposed his penis, and asked for oral sex.  Another time, she was lying on a couch watching television with friends.  Defendant suddenly pushed her down, straddled her, pinned her wrists, and tried to pull her pants down.  When she resisted, defendant ordered his younger brother to remove her pants.  The brother refused, telling defendant to leave her alone.  On a third occasion, Julia went into her friend's bathroom to escape defendant when he was pestering her to have sex.  Defendant followed her in, shut the door behind him, and turned off the light.  He pulled a gun and held the barrel near his chin.  Eventually the friend's mother came to the door, and defendant let her leave.  Sometime later, to end the harassment, Julia did allow defendant to engage in intercourse.[23]

---

[23]    Julia also described two factor (b) incidents related to Patterson.  In the first, she saw Patterson repeatedly slap and kick his girlfriend on a street corner.  In the second, she was lying on a couch and Patterson touched her sexually.

69

Defendant now claims this evidence was insufficient to demonstrate he used or threatened to use force or violence. To the contrary, Julia P.'s testimony clearly establishes that defendant used force when he groped her under the hair dryer and pinned her to the couch by her wrists. In the third incident, defendant prevented her from leaving the bathroom and brandished a firearm. These acts violated several penal statutes. They were sufficient to be admissible as aggravating evidence. (§ 190.3, factor (b).)

ii.  *Impeachment with False Claims of Rape*

Defendant also complains the court erred in precluding him from cross-examining Julia about two false claims of rape. Counsel asked whether Julia had told her friend Nicole that she had sex with Nicole's boyfriend, "Pie," because he forced himself on her. Julia answered, "no," and the prosecutor objected when counsel tried to inquire further. The court sustained the objection under Evidence Code section 352, finding any probative value of this evidence would be substantially outweighed by its prejudicial effect, undue consumption of time, and confusion of the issues. Defense counsel asserted the evidence was relevant as a false accusation of rape, but when pressed for a more specific offer of proof he conceded he had not been able to locate Nicole or her boyfriend. The court ruled that no further questioning on the subject would be permitted until defendant was prepared to produce either of these witnesses.

During the chambers conference, defense counsel mentioned he also wanted to introduce evidence that Julia told "various people" she had had sex with her friend's grandfather, Zeke. Counsel wanted to ask her about these statements and "hopefully the witness will testify truthfully that she lied." The prosecutor objected that this offer of proof did not even involve a false claim of rape, but only sexual activity. Remarking that the offer of proof was "very vague" and the questioning sought appeared to be "a fishing expedition," the court ruled that this line of questioning would be prohibited unless the defense satisfied Evidence

70

Code section 782.[24]  In response, the defense requested a continuance, which was denied.  The court observed that the defense had prior notice of these issues and could recall Julia once it had made the proper showing.

Evidence may be excluded under Evidence Code section 352 "if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."  An exercise of discretion under Evidence Code section 352 will be affirmed unless it was arbitrary, capricious, or patently absurd and the ruling resulted in a miscarriage of justice.  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)  The trial court reasonably exercised its discretion in prohibiting further cross-examination on the witness's sexual activity.

A prior accusation of rape is relevant to the complaining witness's credibility, but only if the accusation is shown to be false.  (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1457.)  In *People v. Bittaker* (1989) 48 Cal.3d 1046, 1097, after a witness testified the defendant threatened her with a gun when she refused his advances, the defendant sought to impeach with evidence that the witness had falsely accused two other men of sexual molestation.  The trial court sustained an Evidence Code section 352 objection, and we affirmed.  We explained:  "The value of the evidence as impeachment depends upon proof that the prior charges were false.  This would in effect force the parties to present evidence concerning two long-past sexual incidents which never reached the point of formal charges.  Such a proceeding would consume considerable time, and divert the attention of the jury from the case at hand."  (*Bittaker*, at p. 1097.)

The same is true here.  Julia denied accusing Pie of rape.  For this line of questioning to have any relevance, then, the defense would have had to establish

---

[24]     This provision requires a written motion and sworn offer of proof, and a hearing, before a complaining witness's sexual activity may be used to attack credibility.  (Evid. Code, § 782.)

both that the accusation was made *and* that it was false.  (See *People v. Tidwell*, *supra*, 163 Cal.App.4th at pp. 1457-1458.)  The trial court reasonably concluded this inquiry would consume undue amounts of time.  Further, it appears that counsel could not establish adequate foundation in light of his admission that he had not located Pie or the person to whom Julia allegedly complained.  Defendant's second proffered impeachment was even further afield.  As the prosecutor observed, this alleged statement was not a claim of rape, but merely that the witness had sex with someone.  It could conceivably have been relevant if the statement was false, but counsel merely "hope[d]" this was the case and did not have ready proof.  The court acted well within its discretion in preventing this fishing expedition from diverting undue time and attention from the trial.

Nor did the court abuse its discretion in denying a continuance.  A midtrial continuance may be granted only for good cause.  "A showing of good cause requires a demonstration that counsel and the defendant have prepared for trial with due diligence.  [Citations.]"  (*People v. Jenkins* (2000) 22 Cal.4th 900, 1037; see § 1050, subd. (e).)  The record demonstrates that defense counsel had been aware of Julia's allegations for at least six months.  Yet they gathered no further evidence to support their argument that she had made false accusations against other men.  Given counsel's unsuccessful attempt to locate the key witnesses, the trial court acted well within its discretion in concluding an additional continuance with no proffered basis to expect success was unjustified.  We note that the court left open an opportunity for the matter to be revisited later if counsel made an appropriate showing.  No such showing was attempted.

### iii. *Hearsay Statements*

On cross-examination, the defense stressed Julia's failure to tell the police about defendant's harassing conduct until shortly before trial and her spotty memory as to what she told the police at various times.  In an attempt to rehabilitate her, the prosecutor asked about a tape-recorded statement she made while in the hospital after Patterson's attack.  When asked if she remembered

72

telling officers how she learned defendant had murdered Beeson, Julia said she overheard someone named Charles say to her friend Lakeisha, " 'your cousin's crazy for killing that white girl.' "  The court allowed the statement but instructed the jury it could not be considered for the truth of the matter asserted but only for its bearing on the witness's ability to recall the day in question.  Defendant raised another hearsay objection when Julia testified that Lakeisha told her defendant and Patterson had killed Beeson because " 'they were trying to rob her, and she wouldn't cooperate so they killed her.' "  The court overruled this objection as well and again told the jury the statement could not be considered for its truth.

Defendant now complains the court violated his due process right to a fair penalty hearing by admitting "highly inflammatory evidence."  He complains the probative value of the evidence was slight because there was no serious dispute about Julia's ability to recall the day in question, or the reasons why she failed to tell the police about defendant's assaultive conduct.  The record belies this assertion.  Defense cross-examination repeatedly challenged Julia's memory of details.  Moreover, the statements were only prejudicial insofar as they implicated defendant in Beeson's murder.  But they were admitted at the *penalty* phase of trial, after the jury had already convicted him.  Accordingly, the statements concerned a crime that was no longer in dispute.  Because defendant's authorities all concern the admission of hearsay statements at the guilt phase, they are inapposite to the question of prejudice here.  Finally, to the extent defendant's reply brief suggests the statements violated *Crawford v. Washington* (2004) 541 U.S. 36, the claim fails.  (See *id.* at p. 59.)  The trial court carefully reminded jurors that the statements could not be considered for their truth.  As nonhearsay, the statements fall outside the *Crawford* rule.

b.    *Violent Acts Committed as a Juvenile*

Over defendant's objection that they were too remote, the court admitted as factor (b) evidence testimony regarding several acts he committed as a juvenile. (See *People v. Anderson* (2001) 25 Cal.4th 543, 586.)  Defendant now challenges

both the direct admission of these juvenile offenses and his expert's testimony on cross-examination about additional incidents. The evidence was properly admitted.

i.   *Background*

When defendant was 12 years old, he and a companion approached a woman who had arrived home late at night and was sitting in her parked van. Defendant ordered her to open the door and give them her money. When she did not comply, he struck the van's windows with a pole, cracking the glass. Defendant's companion pointed a gun at her and threatened to shoot her. The victim started the ignition and drove off, swerving as she heard gunshots.

Berkeley police officers detained defendant at age 13 after he appeared to throw something into bushes. During a pat search, they found a lump of rock cocaine. Defendant struggled and tried to run but was eventually handcuffed.

When he was 14, defendant led police on a high-speed car chase through city streets for over 30 minutes. He eventually hit a patrol car and submitted to arrest. When read his *Miranda* warnings, defendant said, "I shouldn't have run. I should have got out of my car and started shooting at you." He then criticized the officer's gun and bragged that he had been shooting a .357 Magnum revolver earlier that night. Defendant said he threw away the gun and some drugs during the chase. A .357 Magnum revolver was found later that night in an area of the chase.

At age 16, defendant was written up three times for being threatening and disrespectful to Juanita Ream, a teaching assistant at CYA. He called her a "coward" and a "bald-hair bitch" and had to be removed from the classroom by security. He was verbally abusive with the CYA officer and youth counselor who tried to talk with him, refused to cooperate in a search, and had to be physically restrained.

When defendant was 17, a CYA officer overheard him tell his roommate: " 'You are going to be my pussy. You are going to give it to me. I'll make you

74

submit.' " The roommate was lying on the bottom bunk and defendant was leaning over him. Defendant held a weapon fashioned from a toothbrush pointed at his roommate's throat. When defendant was removed from the room, he became physically combative and threatened to harm the officer. Later that year, defendant assaulted a smaller boy as they left the CYA showers. He chased the boy down the hall until two officers subdued him with Mace.

The prosecutor mentioned several additional incidents in cross-examining defendant's expert, Dr. Jamie Candelaria-Greene, about material she read in defendant's juvenile records and discipline reports. For example, defendant's mother reported that he played with matches and at age eight had attempted to set fire to a neighbor's home. From age 10 to 13 defendant lived in a group home, where he had three fist fights with peers and threatened staff on three occasions. Dr. Candelaria-Greene denied seeing reports about armed robberies or auto thefts during this period but did see a juvenile hall report that he had threatened a judge. She also saw reports of defendant's violence against his mother and sister. The court instructed the jury that information referred to in these juvenile reports was not admitted for truth but only to show the basis of the expert's opinions.

ii. *Analysis*

Juvenile criminal activity involving force or threatened violence is admissible in aggravation under factor (b). (See, e.g., *People v. Bivert* (2011) 52 Cal.4th 96, 122; *People v. Taylor*, *supra*, 48 Cal.4th at p. 653; *People v. Lewis* (2001) 26 Cal.4th 334, 378.) "We also have repeatedly held that the admission of such evidence passes constitutional muster. [Citations.]" (*People v. Lee* (2011) 51 Cal.4th 620, 649.) These conclusions were not altered by the high court's decision in *Roper v. Simmons* (2005) 543 U.S. 551 barring execution of those who committed capital crimes when under age 18. *Roper* concerned the Eighth Amendment standard for imposing punishment, not the admissibility of evidence. "It says nothing about the propriety of permitting a capital jury, trying an adult, to

75

consider evidence of violent offenses committed when the defendant was a juvenile." (*People v. Bramit*, *supra*, 46 Cal.4th at p. 1239.)

Defendant urges us to reconsider our holdings based on the Supreme Court's extension of *Roper v. Simmons* in *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455] to sentences of life imprisonment without parole. Yet there too the focus was on Eighth Amendment standards for *punishing* juvenile misconduct. Here, the question is what evidence may be considered when determining punishment for an adult's crime. The high court has never suggested that, in deciding that question, the jury may not consider qualifying criminal conduct the defendant committed as a juvenile. Even if defendant is correct that *Roper* and *Miller* treat juvenile misconduct as less blameworthy than adult misconduct, evidence of forceful or violent conduct is nevertheless relevant to penalty phase questions about character and future dangerousness. (See *People v. Bivert*, *supra*, 52 Cal.4th at p. 123.) Arguments about the offender's youth and immaturity go to the weight of the evidence, not its admissibility.[25]

Defendant also complains that the admission of his juvenile misconduct is inconsistent with section 26, which presumes that children under age 14 are incapable of committing a crime. However, the presumption of incapacity can be rebutted by clear and convincing evidence that the minor knew the wrongfulness of his act. (*People v. Lewis*, *supra*, 26 Cal.4th at p. 378.) Because defendant did not raise this objection below, the prosecutor did not present evidence and the trial court did not make findings on in this regard. To the extent defendant now argues there was insufficient foundation of his capacity, the claim has not been preserved for review. (See *People v. Partida* (2005) 37 Cal.4th 428, 434-435.)

---

[25] The same is true for defendant's assertion that it is "unseemly" to base a death sentence on juvenile misconduct he committed while under the state's supervision. Defendant spent much of his youth in group homes and CYA because he was a violent, repeat offender. He was free to present evidence criticizing the services he received, but defendant's residence in state custody does not make his violent and threatening conduct as a juvenile any less admissible.

c.    *Nonviolent Incidents*

Factor (b) evidence "must violate a penal statute and must be directed against a person or persons, not against property." (*People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1013; see *People v. Boyd* (1985) 38 Cal.3d 762, 778 (*Boyd*).)  The trial court conducted a lengthy pretrial hearing to determine if there was substantial evidence to prove the required elements of each factor (b) crime the prosecution sought to introduce.  (See *People v. Phillips* (1985) 41 Cal.3d 29, 72 fn. 25.)  The court admitted some incidents and excluded others.  Defendant now claims some incidents the court allowed were not sufficiently violent or threatening to be admissible.  The decision to admit factor (b) evidence is within the trial court's discretion, and no abuse of discretion will be found if substantial evidence was presented establishing the crimes.  (*Ibid*.; see *People v. Tuilaepa* (1992) 4 Cal.4th 569, 587.)

i.    *Insults of CYA Teaching Assistant*

First, defendant argues that the incident in which he called the CYA teaching assistant a "coward" and "bald-hair bitch" (see *ante*, at pp. 74-75) did not violate a criminal statute or constitute an imminent threat.  The evidence belies his claim.  Ream testified that defendant was walking around the classroom, calling her a bitch, and saying he did not have to listen to her.  He seemed to be inciting the other students against her.  She felt threatened and called security to have him removed.  Defendant was verbally abusive to the officer who removed him and the counselor who tried to talk to him.  He repeatedly called them cowards and challenged each to "settle things one-on-one."  He became physically agitated and had to be placed in a restraint hold.  Ream reported the incident on a disciplinary form.  When defendant returned to her class afterward, he walked straight to Ream and said, "see, your write-up means nothing.  I can do whatever."  Ream testified she felt threatened during the encounter.

Defendant argues this evidence was inadmissible because there was no evidence he intended to threaten Ream or induced a reasonable belief that any

77

threats could be carried out.  (See *People v. Tuilaepa*, *supra*, 4 Cal.4th at p. 580; *Boyd*, *supra*, 38 Cal.3d at p. 777.)  However, Ream repeatedly testified that she felt threatened, both by defendant's insulting words and his menacing behavior. She could have reasonably understood his statement that her disciplinary write-up meant nothing and he could "do whatever" as a threat of physical retaliation for her call to security.  The crime of unlawful threats can be established even if the defendant had no present ability to act on the threat (*People v. Harris* (2008) 43 Cal.4th 1269, 1311), and the recipient need not perceive any immediate danger of the threat being carried out (*People v. Iboa* (2012) 207 Cal.App.4th 111, 121).

Moreover, even if defendant's verbal abuse of Ream did not rise to the level of criminal threats, evidence about the classroom encounter provided important context for testimony about his removal from the classroom, during which he forcibly struggled and made explicit threats against the security officer and counselor to "settle things one-on-one."  Defendant does not dispute that evidence of this behavior was properly admitted.  " '[W]hen the prosecution has evidence of conduct by the defendant that [is admissible under section 190.3, factor (b)], evidence of the surrounding circumstances is admissible to give context to the episode, even though the surrounding circumstances include other criminal activity that would not be admissible by itself.  [Citation.]' " (*People v. Wallace* (2008) 44 Cal.4th 1032, 1081.)  In *People v. Thomas* (2011) 51 Cal.4th 449, 505, evidence that the defendant had called a witness's son "names like 'punk' and 'sissy' " was properly admitted as a surrounding circumstance of a factor (b) crime.  The same is true here.

ii.      *Threatening Statements to Deputies*

Next, defendant challenges the admission of several factor (b) incidents arising from his clashes with CYA deputies.  All of the evidence was properly admitted.

Deputy Tammy Wyatt reported defendant for passing hot water to another inmate, a rules violation.  Angry about his limited access to hot water, defendant

78

warned a deputy that anyone who tried to enter his cell would be assaulted. When Deputy Wyatt brought him a food tray that week, he shoved it back at her. Defendant was interviewed about the disciplinary report and stated that "if he wanted to get a write-up, he could get one for a much more severe incident." He then repeated there would be "trouble" if deputies entered his cell. When the interview ended and defendant's restraints were removed, he refused to step into the pod. Instead, he turned to Deputy Wyatt and told her she had "better not come up to his cell." Contrary to defendant's claim, this remark could only have been intended, and understood, as a threat. Defendant was visibly angry with Deputy Wyatt, had recently tried to hit her with a tray, and had repeatedly threatened to physically assault any deputy who visited his cell. Defendant's warning to Wyatt clearly implied that defendant planned to assault her if she came to a place where he was unrestrained.

Defendant made a similar threat to Deputy William Humphries when the deputy had to tell him repeatedly to end a telephone call and return to his cell. Defendant yelled, "You better check your attitude. You came in here with attitude today. You don't know who you are dealing with. I'll be here everyday, Humphries." When the deputy began writing up a discipline report, defendant added, "I don't care if you are writing me up. . . . I don't care where I get sent. You need to check your stuff. You still have to come in my room." Although defendant now minimizes this incident as mere "mouthing off," his words clearly implied a threat to assault Deputy Humphries when the opportunity arose, and the deputy understood the statements as threatening.

Defendant also challenges the admissibility of Humphries's testimony that this incident occurred when defendant was in an administrative segregation unit for high-profile or violent inmates. Rather than object, defense counsel chose to cross examine the deputy on procedures in the segregated unit. Absent an objection, defendant's current challenge to the testimony is forfeited. (See *People*

*v. Partida*, *supra*, 37 Cal.4th at pp. 434-435.)[26]  In any event, as defendant's reply brief concedes, this evidence was relevant context for Deputy Humphries's perception of defendant's statements as a threat.

Finally, defendant argues a deputy impermissibly testified that he had a reputation for violence.  (See *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1233.) Deputy Charles Foster testified briefly about a factor (b) incident involving Patterson.  In cross-examination, defendant's attorney solicited the deputy's views about defendant's demeanor in prison.  Deputy Foster recalled having no real problem with defendant, whom he considered no different than most other inmates.  On redirect, the prosecutor asked whether defendant had a reputation in the sheriff's department as being excessively violent toward staff.  The court allowed the question, finding that counsel's cross-examination had opened the door to inquiry about defendant's character.  Foster answered "yes" and confirmed hearing about defendant's reputation over many years from many different deputies.

Evidence offered in rebuttal to defense mitigation evidence need not relate to any specific aggravating factor under section 190.3.  (*Coffman and Marlow*, *supra*, 34 Cal.4th at p. 109.)  We have repeatedly held that impeachment is permissible in the penalty phase when a defense witness offers testimony bearing on the defendant's character.  (*People v. Payton* (1992) 3 Cal.4th 1050, 1066; *People v. Wagner* (1975) 13 Cal.3d 612, 619.)  Defense counsel elicited testimony from Deputy Foster suggesting defendant was no more violent than other inmates. The People were entitled to rebut that suggestion with evidence that, notwithstanding Deputy Foster's view, defendant was known to be an especially

---

[26]    Defendant also did not object when Patterson's attorney elicited testimony from Deputy Judith Miller-Thrower that defendant's administrative segregation status required that he be transported in chains, even inside the jail.  His present challenge to this testimony was therefore not preserved.  (*People v. Zamudio*, *supra*, 43 Cal.4th at p. 354; *People v. Partida*, *supra*, 37 Cal.4th at pp. 434-435.)

violent inmate.  "A defendant has no right to mislead the jury through one-sided character testimony during either the guilt or penalty trial.  We do not believe that defendant was entitled to elicit testimony suggesting that he was [nonviolent], and at the same time to preclude the People from introducing contrary evidence."  (*People v. Siripongs* (1988) 45 Cal.3d 548, 578.)

### iii.    *Defendant's Statement to Parole Officer*

Parole Officer Craig Jackson testified about defendant's good behavior leading up to his release from CYA.  During his last year there, defendant had no serious disciplinary infractions, had a job, attended classes in victim awareness and anger management, and expressed understanding of the seriousness of his conduct.  Defendant's maturity level increased.  He demonstrated insight into the reasons for his actions and understood how he could avoid violence in the future.  In the context of this testimony, Officer Jackson related that defendant told him " 'he often reacted aggressively in order to gain stature among his peers and to make himself feel good.' "  Defendant now argues this statement was inadmissible under factor (b).  We disagree.  The statement reflected defendant's insight into *why* he had committed the many factor (b) offenses presented over the preceding days.  It was relevant context for these offenses and admissible as a surrounding circumstance.  (See *People v. Wallace*, *supra*, 44 Cal.4th at p. 1081.)  It was also relevant as a projection of defendant's state of mind with respect to the Beeson murder, and thus admissible as a circumstance of this crime under section 190.3, factor (a).  (See *People v. Nelson* (2011) 51 Cal.4th 198, 224.)  Finally, "[e]vidence of statements from defendant's own mouth demonstrating his attitude toward his victims was highly probative" on the issue of future dangerousness.  (*People v. Payton*, *supra*, 3 Cal.4th at p. 1063.)

### 3.    *Expert Testimony on Antisocial Personality Disorder and Future Dangerousness*

Defendant contends the court erred in allowing the prosecutor to cross-examine his expert witness about antisocial personality disorder and future

dangerousness. Given the scope of the expert's direct examination, these topics were properly raised for impeachment.

The defense called Jamie Candelaria-Greene, Ph.D., an expert in learning disabilities and special education. At the outset of her testimony, the court read a standard instruction explaining that an expert's opinions should be assessed in light of the expert's qualifications and the supporting facts and reasons. Dr. Candelaria-Greene had reviewed defendant's school, medical, probation, and CYA records but had not met with defendant before the trial. Based on her record review, she testified that defendant suffered from ADHD. Defendant had never received medication or counseling for that condition.

Defense counsel specifically asked if the expert was aware of studies examining the effects of giving prisoners ADHD medication, such as Ritalin. She described "an excellent study" in which Colorado adult prisoners who showed classic signs of ADHD were given Ritalin and counseling. After six months, their recidivism rate "plummeted" from the nationwide average of 50 to 60 percent down to 10 percent. Those still in prison were better able to participate in hobbies and vocational education, "but most of all, there was a greater degree of safety associated with . . . the prisoners and those around" them. Defense counsel also asked her about the Diagnostic and Statistical Manual (DSM-IV). She confirmed she was familiar with the DSM-IV and explained that it is used for diagnosing psychiatric conditions, including ADHD.

On cross-examination, the prosecutor asked about the DSM-IV requirements for diagnosing antisocial personality disorder. The expert eventually agreed that defendant had been repeatedly diagnosed with a conduct disorder and fit the other DSM-IV requirements for antisocial personality disorder. She did not actually give her own diagnosis that defendant had this disorder. Much of her testimony was based on hypothetical questions, and she repeatedly protested that she was not a psychologist. Defendant objected that Dr. Candelaria-Greene was not qualified to testify about the contents of the DSM-IV. The court found the

82

questioning proper because the expert testified on direct examination that she had relied on the DSM-IV in reaching her conclusions. At defendant's request, however, the court gave a limiting instruction explaining that any reports referenced or read during the expert's testimony were not admitted for truth but only to show the basis of her opinions.

The prosecutor also asked about defendant's history of violent incidents in school and CYA. The expert agreed that, without a change in environmental conditions, past violence is the best predictor of future dangerousness. In particular, she testified that defendant's potential for future violence was high given his past behavior. Defendant objected at sidebar that the subject of future dangerousness was beyond her expertise. The court overruled this objection, observing that the "linchpin" of her direct examination testimony was that defendant would be safe around others in prison if he were treated with Ritalin and counseling. Having raised the subject of defendant's future violence in prison, the court ruled the defense could not insulate it from cross-examination. (See *People v. Gates* (1987) 43 Cal.3d 1168, 1211, disapproved on another ground in *People v. Williams*, *supra*, 49 Cal.4th at p. 459.) When the court later described its ruling on the record, defendant's attorney clarified his objection. He said, "There is no question that we raised it and that it was proper to discuss future dangerousness." Instead, he meant to object that questions about material in psychiatric reports were beyond her area of expertise.

This concession fatally undermines defendant's challenge to the cross-examination on future dangerousness. (*People v. Partida*, *supra*, 37 Cal.4th at pp. 434-435.) In any event, the claim lacks merit. " 'While the prosecution is prohibited from offering expert testimony predicting future dangerousness in its case-in-chief [citation], it may explore the issue on cross-examination or in rebuttal if defendant offers expert testimony predicting good prison behavior in the future. [Citations.]" (*People v. Jones*, *supra*, 29 Cal.4th at p. 1260.) Defendant raised the issue when he elicited testimony that ADHD prisoners treated with

medication and counseling exhibited "a greater degree of safety" than was otherwise expected of them. Having chosen to raise this subject, the defense could not reasonably insulate it from cross-examination. (*People v. Gates*, *supra*, 43 Cal.3d at p. 1211.)

Defendant's challenge to cross-examination based on the DSM-IV is similarly unavailing. We rejected this same claim in *People v. Seaton* (2001) 26 Cal.4th 598, 679-680. There, after a defense expert testified that the defendant suffered an anxiety disorder and an atypical personality disorder, the prosecutor used the Diagnostic and Statistical Manual to demonstrate on cross-examination that defendant met the requirements for a diagnosis of antisocial personality disorder. (*Id*. at p. 679.) We held this questioning was within the bounds of appropriate impeachment. (*Id*. at pp. 679-680; see *People v. Mills*, *supra*, 48 Cal.4th at p. 207 ["Because the defense experts relied on the DSM-IV to reach their opinions, the prosecutor was permitted to explore their familiarity with the DSM-IV on cross-examination"].) Defendant attempts to distinguish *Seaton* and *Mills* because those cases involved no dispute about the expert's qualification to render a psychiatric opinion. He argues Dr. Candelaria-Greene was not qualified to diagnose antisocial personality disorder. However, defendant himself offered her expert diagnosis of ADHD based on the criteria in the DSM-IV. "When, as here, a mental health expert offers a diagnosis, this opens the door to rebuttal testimony questioning that diagnosis or suggesting an alternative diagnosis. [Citation.]" (*People v. Smith* (2005) 35 Cal.4th 334, 359; see *People v. Daniels* (1991) 52 Cal.3d 815, 883.)

We have never held that cross-examination must be confined to questions about the precise diagnosis an expert offers. Nor do our cases require that prosecutors present alternate diagnoses through rebuttal testimony, instead of cross-examination. Either way, the evidence is permissible as impeachment of the expert's opinion. (See *People v. Daniels*, *supra*, 52 Cal.3d at p. 884.) Finally, it would be anomalous to hold that deficiencies in an expert's qualifications

84

somehow shield her opinions from vigorous testing on cross-examination. Indeed, those deficiencies were themselves an appropriate topic of cross-examination. (Evid. Code, § 721, subd. (a).)[27]

### 4. *Prosecutorial Misconduct*

Defendant claims the prosecutor committed several acts of misconduct, violating his rights to a fair trial and penalty determination. "Improper comments by a prosecutor require reversal of a resulting conviction when those comments so infect a trial with unfairness that they create a denial of due process. [Citations.] Conduct by a prosecutor that does not reach that level nevertheless constitutes misconduct under state law, but only if it involves the use of deceptive or reprehensible methods to persuade the court or jury. [Citation.]" (*People v. Watkins* (2012) 55 Cal.4th 999, 1031.) None of the challenged incidents constitutes prejudicial misconduct.

### a. *Epithets*

Defendant complains the prosecutor committed misconduct when he used two epithets. In opening statement, the prosecutor referred to defendant and Patterson as "evil men." Defendant objected the next day. The court sustained the objection and directed the prosecutor not to use that characterization in the remainder of his opening statement. The second epithet occurred during the cross-examination of Dr. Candelaria-Greene. The prosecutor asked a hypothetical question about assessing an unwilling subject, whom he referred to as a "violent jerk." The court sustained defense counsel's objection and told the prosecutor to rephrase the question. The prosecutor then described in detail all the personality

---

[27] In his reply brief, defendant argues the court in its gatekeeper role has a duty to vet proffered expert opinions. (See Evid. Code, §§ 801-802; *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769.) Once again, defendant ignores that the challenged testimony was elicited on cross-examination. The prosecutor did not "proffer" Dr. Candelaria-Greene's opinion. Rather, he *impeached* the opinions she offered on direct examination by demonstrating that the records she reviewed supported an alternative diagnosis. We need not further discuss defendant's analysis of the *Sargon* precedent.

attributes he was referring to with the shorthand "jerk." The defense raised no further objection.

For a prosecutor's remarks to constitute misconduct, it must appear reasonably likely in the context of the whole argument and instructions that " 'the jury understood or applied the complained-of comments in an improper or erroneous manner.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667.) To the extent defendant's objections were preserved, the mild and fleeting descriptions here do not rise to the level of misconduct. In *People v. Zambrano* (2007) 41 Cal.4th 1082, 1172, the prosecutor repeatedly called the defendant " 'evil' " in closing argument. We found no misconduct, noting that several more derogatory epithets have been found within the range of permissible argument. (*Ibid*.; see e.g., *People v. Friend* (2009) 47 Cal.4th 1, 84 [defendant called an " 'insidious little bastard' "]; *People v. Thomas* (1992) 2 Cal.4th 489, 537 [defendant called a " 'perverted murderous cancer' "].) Similarly, in *People v. Farnam*, *supra*, 28 Cal.4th at page 168, we concluded opening statement descriptions of the defendant as " 'monstrous,' " " 'cold-blooded,' " and a " 'predator' " were fair comment on what the prosecutor expected the evidence would show.

Moreover, the jury was instructed that opening statements are not evidence but merely reflect counsel's prediction of what the evidence will show. With respect to the hypothetical question that insinuated defendant was a "jerk," the jury was also instructed that questions of counsel are not evidence. Considering these admonitions, and the ample evidence of the murder's brutality and defendant's callous behavior afterward, it is not reasonably likely that the prosecutor's description of him as "evil" or a "violent jerk" improperly inflamed the jury. (See *People v. Friend*, *supra*, 47 Cal.4th at p. 84.)

b.     *Closing Argument*

Defendant claims the prosecutor committed misconduct three times in closing argument by referencing facts not in evidence.

86

First, the prosecutor challenged Dr. Candelaria-Greene's credibility by observing that her opinions contradicted those of many experts whose reports she had reviewed. The experts who had evaluated defendant in person all concluded his potential for future violence was high. In contrast, the prosecutor argued, Dr. Candelaria-Greene "wouldn't even sit down with him face-to-face. Now[,] whether that's a [sleight]-of-hand legal strategy or she didn't want to be in the same room with him, don't know. But she wouldn't even sit in the same room with him."

Defendant did not object to this statement and therefore forfeited a claim of misconduct. "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground— the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

The claim also fails on the merits. Defendant complains that the prosecutor's remarks about why Dr. Candelaria-Greene may have failed to meet with defendant were pure speculation. But the challenged remarks were not phrased as assertions. By expressly stating that he did not know why the expert failed to meet with defendant, the prosecutor conceded the reasons he was offering were merely reasonable possibilities. His point was that no conceivable reason justified offering an opinion without an in-person evaluation. In context, it is not reasonably likely the jury would have misunderstood his comments as asserting a definitive reason for the lack of a face-to-face meeting.

Second, defendant contends the prosecutor implicitly attacked his character when he argued: "Where are the family members? They're here in the community; they're local; they're around. Where are they? Why didn't they come in here and tell you something?" Because defendant did not object to these remarks, he forfeited any claim of error. (*People v. Clark*, *supra*, 52 Cal.4th at p. 960.) Moreover, we have held that argument about the absence of a defendant's

family members from trial does not constitute misconduct, but permissible comment on the defendant's failure to call logical witnesses. (*People v. Zambrano*, *supra*, 41 Cal.4th at pp. 1173-1174.) The argument here was within appropriate bounds.

Third, defendant complains the prosecutor's closing argument exaggerated the pleasures of prison life. After describing the trauma Beeson's family endured, the prosecutor compared the defendants' life in custody: "They go on. They have their life in jail, their card games, their basketball games. . . . [¶] There's a social life, their jobs, schools, educational opportunities." Defense counsel objected at sidebar that no evidence had been presented on the conditions in state prison. The court sustained the objection but allowed the prosecutor to argue about evidence that *was* presented on the conditions in CYA and county jail. When argument resumed, the prosecutor stated: "You've heard from evidence what life is like in jail and what life is like in the California Youth Authority. You get to play sports, basketball, card games, make home-made alcohol; there's marijuana, cookies, and enchiladas, canteen privileges. There are . . . telephones, there are letters, there are visits. There's sex. You've heard evidence that a full life exists behind bars. Maybe not the life . . . you would like to think of, but . . . if you get yourself a life sentence out of this trial, you get to have that institutional life, and you've heard evidence about jail and about the California Youth Authority, and that includes all those things, things to look forward to. Most of the same things that we all have in our lives now, although they're in a different form." He then stressed that defendants had taken all of these joys of life from Beeson and destroyed her family.

Although defendant objected, and his objection was sustained, he did not ask the court to admonish the jury to disregard the prosecutor's argument. Accordingly, he forfeited this challenge on appeal. (*People v. Redd* (2010) 48 Cal.4th 691, 753.) In any event, it was unlikely the jury would have misunderstood the prosecutor's initial argument to be about state prison

88

conditions. After the sidebar, he repeatedly referenced specific evidence the jury had heard about conditions in both CYA and county jail. Moreover, defense counsel's final argument dispelled any prejudice that may have arisen. While not permitted to discuss any specific prison where defendant might be sent, defendant's attorney argued that the prosecutor's "country club theory" of prison life "never gives us any detail about such things as lack of freedom, lack of choice, even lack of basic privacy. With the toilet and wash basin in the cell, people have likened it to living their entire lives in a bathroom." He also described the small size of the cell and the fact that defendant would have little contact with his family or the outside world.

Separately, defendant claims the court erred in allowing the prosecutor to argue that there was no evidence of an emotional disturbance. Killing while under the influence of an extreme mental or emotional disturbance may be considered in mitigation under section 190.3, factor (d). In the course of discussing all mitigation factors, the prosecutor simply pointed out that no evidence had been presented in support of factor (d). Defendant does not dispute the truth of this point but claims the argument implicitly suggested jurors could consider absence of the mitigating factor as a factor in aggravation. It is true that "the *absence* of this mitigating factor is not itself aggravating." (*People v. Riel* (2000) 22 Cal.4th 1153, 1223; see *People v. Davenport* (1985) 41 Cal.3d 247, 289-290.) However, the prosecutor never invited the jury to draw this improper inference. On the contrary, after arguing that no mitigating evidence had been presented regarding defendant, the prosecutor stated: "I want to be absolutely clear. I've talked to you about evidence has to be used in categories . . . . I've talked to you about aggravating factors. There is not an aggravating factor that in any way says lack of mitigation. So the fact that there's no mitigation for Norman Patterson, that is not an aggravating factor. Okay. It's important that you apply this evidence properly. . . . [¶] So the absence of mitigation is not an aggravating factor." This argument was appropriate and the court did not err in allowing it.

c.      *Rebuttal Argument*

Defendant raises three complaints of misconduct in the prosecutor's rebuttal argument.  Each of these claims was forfeited by lack of an objection and, on the merits, fails to establish prejudicial misconduct.

First, defendant contends the prosecutor attacked the integrity of defense counsel by pointing out their positions throughout the trial.  He reminded jurors that at the guilt phase defense counsel had argued defendant was innocent and had falsely confessed.  The prosecutor then observed, "Now you are being told by the same attorney for the same defendant, oh, well, he did do it.  Okay.  You guys are right.  We tried to fool you last time."  Still speaking in the role of defense counsel, the prosecutor said, "It's as though it is whatever we can say to try and fool you and beat you.  Whatever we can say to try and trick you into making a mistake as a jury, to get you to make the wrong decision that will favor the defendants.  [¶] We will say anything to you, anything whatsoever."  The prosecutor then briefly explained the concept of lingering doubt and stressed that it should not apply because, in saying they did not contest the guilt phase verdict, the defendants' lawyers were acknowledging their clients' guilt.  He continued:  "So, to the extent that you heard arguments to the contrary at the end of the guilt phase, you were being intentionally misled."  The prosecutor then urged jurors to be skeptical of defense counsel's penalty phase arguments, contending they would say anything to persuade the jury to return the more lenient sentence.

Defendant failed to raise a timely objection to this argument and therefore forfeited his claim of misconduct.  (*People v. Gionis* (1995) 9 Cal.4th 1196, 1215.)  On the merits, the remarks did not result in prejudicial error.

Personal attacks on the integrity of opposing counsel can constitute misconduct.  (*People v. Espinoza* (1992) 3 Cal.4th 806, 820.)  "It is generally improper for the prosecutor to accuse defense counsel of fabricating a defense [citations], or to imply that counsel is free to deceive the jury [citation].  Such attacks on counsel's credibility risk focusing the jury's attention on irrelevant

90

matters and diverting the prosecution from its proper role of commenting on the evidence and drawing reasonable inferences therefrom." (*People v. Bemore* (2000) 22 Cal.4th 809, 846.) However, "the prosecutor has wide latitude in describing the deficiencies in opposing counsel's tactics and factual account." (*Ibid.*)

The prosecutor's remarks here highlight the inconsistency in defense counsel's positions about the truth of the confession. Although counsel nominally accepted the jury's verdict that defendant gave a true confession, he argued the police had promised defendant he could avoid the death penalty by confessing and told the jury, "You, in fact, are the only ones who can give Grayland the benefit of his bargain . . . ." We have upheld prosecutorial arguments suggesting defense counsel's "job" is to confuse the jury and say anything necessary to obtain a favorable verdict. (See *People v. Gionis*, *supra*, 9 Cal.4th at pp. 1216-1217; *People v. Bell* (1989) 49 Cal.3d 502, 538.) Although the remarks here were somewhat harsher, in that the prosecutor characterized counsel's arguments as intentionally misleading, he did not claim defense counsel had fabricated a defense or deceived the jury about the evidence they were to consider. (See *People v. Clark*, *supra*, 52 Cal.4th at p. 961.) In any event, even if the comments were unfair to defense counsel, they "did not comprise a pattern of egregious misbehavior making the trial fundamentally unfair." (*People v. Espinoza*, *supra*, 3 Cal.4th at p. 820.) Nor was it reasonably possible they affected the verdict. (See *People v. Peoples* (2016) 62 Cal.4th 718, 804; *People v. Abilez* (2007) 41 Cal.4th 472, 525-526.) Even though the remarks were directed against all of the defense lawyers,[28] the jury reached different verdicts for defendant and Patterson.

Next, defendant claims the prosecutor improperly asked jurors to place themselves in the victim's position and argued the facts of other cases.

---

[28] Defendant and Patterson were each represented by two attorneys throughout the trial.

Defendant's attorney had argued Beeson's death was merely an impulsive murder and not "the worst of the worst," such as a terrorist bombing, sniper killing, or one involving kidnapping or sexual assault. In response, the prosecutor asked the jury to imagine the experience of someone murdered by a bomb or a sniper. Those victims are instantaneously killed and "never knew what hit them." Then he asked the jury to think about everything Beeson experienced: being held down on the floor, hit in the face with a shotgun, "having a belt put around your neck . . . . having two men holding you down on the floor with their knees and each one has an end on that belt and they are pulling and yanking . . . . [¶] Think about fighting for your life because you want to live." He then argued Beeson suffered more than the 167 people who died instantly in the Oklahoma City bombing. After the court sustained an objection to argument about other cases, the prosecutor rephrased his point only slightly, stating, "She suffered more than a hundred victims suffered in a bomb blast . . . ." Finally, he asked the jury to think about how painful the stabbing must have been and how frightened Beeson must have felt.

Defendant now argues it was misconduct for the prosecutor to suggest that jurors adopt Beeson's position. Because he did not object below, however, the trial court had no opportunity to consider the objection, admonish the jury, or curtail argument along these lines. (See *People v. Bemore*, *supra*, 22 Cal.4th at pp. 845-846.) A failure to object and request an admonition will be excused only if an objection would have been futile or an admonition would not have cured the harm. (*People v. Cole* (2004) 33 Cal.4th 1158, 1201.) Defendant has shown neither; therefore the objection is forfeited on appeal. (*People v. Redd*, *supra*, 48 Cal.4th at p. 753.)

The claim also fails on the merits. Although it is inappropriate at the *guilt* phase for a prosecutor to appeal to sympathy by inviting the jury to view the case through the victim's eyes (*People v. Leonard* (2007) 40 Cal.4th 1370, 1406-1407), such appeals are entirely appropriate at the *penalty* phase. (*People v. Wash*, *supra*,

92

6 Cal.4th at p. 263.)  The prosecutor encouraged jurors to think closely about the suffering Beeson endured during defendants' long and brutal attack in response to defense counsel's minimization of the murder as a "rash, impulsive killing with weapons at hand."  " 'To the extent that the argument was inviting the jurors to put themselves in the shoes of the victim, we have found such an appeal appropriate at the penalty phase because there "the jury decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death. . . .  In this process, one of the most significant considerations is the nature of the underlying crime. [Citation.]  Hence assessment of the offense from the victim's viewpoint would appear germane to the task of sentencing." ' "  (*Id*. at pp. 263-264; see *People v. Lewis* (1990) 50 Cal.3d 262, 283-284.)  Nor did the prosecutor's argument encourage the jury to subordinate their reason to emotion.  (See *Wash*, at p. 264.)

Finally, defendant complains the prosecutor ignored the court's ruling when he revised his comparison to the Oklahoma City bombing to describe a generic bombing with "a hundred" victims. Defendant did not renew his objection, thus forfeiting his claim on appeal.  (*People v. Redd*, *supra*, 48 Cal.4th at p. 753.)  In any event, this brief reference to bombing victims did not rise to the level of misconduct.  Although the precise crime the prosecutor had in mind was clear from his previous statement, he technically complied with the court's ruling by rephrasing his remark to refer to a generic bombing.  No misconduct occurred.

d.    *Cumulative Prejudice*

Defendant argues that even if individual acts of prosecutorial misconduct were not prejudicial, the incidents considered together were so cumulatively prejudicial as to require reversal.  Although we observed that some statements in the prosecutor's rebuttal argument bordered on misconduct, they did not render the trial unfair or prejudice defendant.  None of the other challenged statements constituted misconduct.  Accordingly, there was no prejudice to accumulate.

93

5.      *Refusal to Modify Death Sentence*

Defendant claims the court erred in denying his automatic motion to modify the death verdict.  (§ 190.4, subd. (e).)  In ruling on such a motion, "the trial court must reweigh independently the evidence of aggravating and mitigating circumstances and then determine whether, in its independent judgment, the weight of the evidence supports the jury's verdict.  [Citations.]  The trial court must 'consider, take into account, and be guided by' the aggravating and mitigating circumstances referred to in section 190.3."  (*People v. Crittenden*, *supra*, 9 Cal.4th at p. 150.)  "On appeal, we review the trial court's ruling independently, but it is not our role to redetermine the penalty in the first instance.  [Citations.]"  (*People v. Gamache* (2010) 48 Cal.4th 347, 403.)

Defendant complains the court "either minimized the mitigating factors or ignored them, while at the same time exaggerating the aggravating factors and giving them undue weight."  The assertion is meritless.  The court's extensive ruling, spanning 46 pages of reporter's transcript, meticulously examines all the evidence presented on each relevant sentencing factor.  The court discussed the evidence in an even-handed manner.  It independently and reasonably concluded that aggravating circumstances outweighed mitigating circumstances and the jury's verdict was supported by "the overwhelming weight of the evidence."

Defendant finds fault with only one specific sentence in this voluminous record.  He notes that, when describing the facts leading up to the murder, the court stated that defendant "coveted a gun to use in committing robberies, perhaps in committing murders."  Defendant asserts this statement included improper speculation because there was no evidence he wanted a gun to commit murder.  The evidence was undisputed that defendant sought a gun to commit robberies.  The court qualified its statement about murders by noting that "perhaps" defendant wanted the gun for this purpose as well, and this was a reasonable inference to be drawn from testimony that defendant was not opposed to killing bystanders during robberies.  This brief inference from the evidence does not undermine the court's

94

careful, independent, thorough review of the evidence, which we conclude is amply supported by the record.

6.  *Cumulative Error*

Defendant claims that even if the alleged errors were individually harmless, they were cumulatively prejudicial. We found that stationing a deputy at the witness stand during defendant's testimony unsupported by case-specific reasons was error, but harmless. In addition, while noting the claim was not preserved, we also found harmless any assumed misconduct arising from the prosecutor's rebuttal argument. There are no additional errors, assumed or otherwise, to accumulate.

7.  *Imposition of Death Penalty for Felony Murder*

Defendant was eligible for the death penalty because the jury found that he murdered Beeson in the course of a robbery. "The felony-based special circumstances do not require that the defendant intend to kill. It is sufficient if the defendant is the actual killer or either intends to kill or 'with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission' of the felony. [Citations.]" (*People v. Rountree* (2013) 56 Cal.4th 823, 854.)

Defendant now argues capital punishment for felony murder violates the Eighth Amendment and international law. We have long held that the death penalty is constitutional when, as here, the defendant is the actual killer. (See, e.g., *People v. Watkins*, *supra*, 55 Cal.4th at pp. 1033-1034; *People v. Taylor*, *supra*, 48 Cal.4th at p. 661.) Furthermore, "[i]mposition of the death penalty absent a finding of a culpable mental state for an actual killer does not violate international law because international law does not prohibit a sentence of death rendered in accordance with state and federal constitutional and statutory requirements." (*People v. Chism* (2014) 58 Cal.4th 1266, 1333.)

8.    *Delay in Processing Death Penalty Appeals*

Defendant was sentenced to death in June 2003.  Almost nine years later, after delays in the appointment of appellate counsel and correction of the record, he filed his opening brief on appeal.  Defendant argues the delay in processing his appeal violates international norms as well his constitutional rights to due process, equal protection, and freedom from cruel and unusual punishment.  We have consistently rejected this claim, explaining that "the automatic appeal process following judgments of death is a constitutional safeguard, not a constitutional defect [citations], because it assures careful review of the defendant's conviction and sentence [citation]." (*People v. Anderson*, *supra*, 25 Cal.4th at p. 606.)  Moreover, while we remain sensitive to the evolution of Eighth Amendment doctrine, we recently found no factual basis for concluding that systemic delays render California's capital punishment scheme arbitrary and capricious.  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1368-1375.)  The record here is likewise insufficient to support such a claim.

9.    *Constitutionality of Death Penalty Law*

Defendant raises several challenges to the constitutionality of California's capital sentencing scheme, all of which this court has previously rejected.  Defendant presents the claims to preserve them for federal review, but he does not persuade us to reconsider any of these settled decisions.  Once again, we hold as follows:

Section 190.2 adequately narrows the category of death-eligible defendants and is not impermissibly overbroad under the requirements of the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  (*People v. Whalen* (2013) 56 Cal.4th 1, 90; *People v. Jones* (2012) 54 Cal.4th 1, 85.)  The various special circumstances are not unduly numerous or expansive.  (*People v. Linton* (2013) 56 Cal.4th 1146, 1214; *People v. Jennings* (2010) 50 Cal.4th 616, 688; *People v. Stanley* (1995) 10 Cal.4th 764, 842-843.)

Section 190.3, factor (a), which directs the jury to consider circumstances of the crime, does not allow arbitrary and capricious sentencing in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (*People v. Linton*, *supra*, 56 Cal.4th at pp. 1214-1215.)  " 'Defendant's argument that a seemingly inconsistent range of circumstances can be culled from death penalty decisions proves too much.  What this reflects is that each case is judged on its facts, each defendant on the particulars of his offense.  Contrary to defendant's position, a statutory scheme would violate constitutional limits if it did not allow such individualized assessment of the crimes but instead mandated death in specified circumstances.' (*People v. Brown* (2004) 33 Cal.4th 382, 401.)"  (*People v. Jennings*, *supra*, 50 Cal.4th at pp. 688–689; see also *Tuilaepa v. California* (1994) 512 U.S. 967, 976 [§190.3, factor (a) not unconstitutionally vague].)

The use of unadjudicated criminal activity as an aggravating factor does not violate due process or the right to a jury trial, nor must the jury make a unanimous finding on this or any other evidence admitted under factor (b).  (*People v. Whalen*, *supra*, 56 Cal.4th at p. 91; *People v. Ward* (2005) 36 Cal.4th 186, 221-222.)

There is no constitutional requirement that the jury unanimously find beyond a reasonable doubt the existence of aggravating factors, that aggravating factors outweigh mitigating factors, or that death is the appropriate penalty. (*People v. Whalen*, *supra*, 56 Cal.4th at p. 90; *People v. Clark*, *supra*, 52 Cal.4th at p. 1007; *People v. Blair* (2005) 36 Cal.4th 686, 753.)  "The high court's decisions interpreting the Sixth Amendment right to jury trial (*Ring v. Arizona* (2002) 536 U.S. 584; *Apprendi v. New Jersey* (2000) 530 U.S. 466) do not require otherwise. [Citations.]"  (*Clark*, at p. 1007; see *People v. Prieto* (2003) 30 Cal.4th 226, 275.) Nor does any constitutional provision require an instruction on the reasonable doubt standard for determining penalty at a capital trial.  (*People v. Linton*, *supra*, 56 Cal.4th at pp. 1215-1216; *Blair*, at p. 753.)  On the contrary, trial courts should not instruct on any burden of proof or persuasion at the penalty phase because

sentencing is an inherently moral and normative function, and not a factual one amenable to burden of proof calculations. (*People v. Lee*, *supra*, 51 Cal.4th at pp. 655-656; *People v. Avila* (2009) 46 Cal.4th 680, 724; *People v. Lenart* (2004) 32 Cal.4th 1107, 1136-1137; see *Kansas v. Carr* (2016) 577 U.S. __ [136 S.Ct. 633, 642] [penalty phase evaluation of mitigating circumstances is not susceptible to a standard of proof].)

Because nothing in the penalty phase instructions would mislead a jury into believing mitigating factors had to be found unanimously, a specific instruction to this effect was not required. (*People v. Boyette*, *supra*, 29 Cal.4th at p. 466; *People v. Weaver* (2001) 26 Cal.4th 876, 988.) "Nor is an instruction on the *absence* of a burden of proof constitutionally required. [Citation.]" (*People v. Brasure* (2008) 42 Cal.4th 1037, 1067.) The federal Constitution does not require that the court designate which factors are aggravating or mitigating, or instruct the jury that certain factors are relevant only in mitigation. (*People v. Linton*, *supra*, 56 Cal.4th at p. 1216; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1064.)

The lack of written findings by the jury during the penalty phase does not violate the federal Constitution or deprive a capital defendant of meaningful appellate review. (*People v. Linton*, *supra*, 56 Cal.4th at p. 1216; *People v. Whalen*, *supra*, 56 Cal.4th at pp. 90-91.) Intercase proportionality review, comparing defendant's case to other murder cases to assess relative culpability, is not required by the due process, equal protection, fair trial, or cruel and unusual punishment clauses of the federal Constitution. (*Whalen*, at p. 91; *People v. Cook* (2006) 39 Cal.4th 566, 619.) Nor does the death penalty statute violate equal protection by providing capital defendants with different procedural safeguards than those given to noncapital defendants. (*People v. Williams* (2008) 43 Cal.4th 584, 650; *People v. Clark*, *supra*, 52 Cal.4th at p. 1008.) Finally, California's use of the death penalty does not violate international norms or evolving standards of decency in violation of the Eighth and Fourteenth Amendments. (*Linton*, at p. 1217; *Whalen*, at p. 92; *Clark*, at p. 1008.)

## DISPOSITION

The judgment is affirmed.

**CORRIGAN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

## CONCURRING OPINION BY LIU, J.

Today's opinion restates two aspects of our *Batson/Wheeler* jurisprudence that merit reexamination in an appropriate case. (*Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*); *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).)

First, with respect to comparative juror analysis, the court says: "Pretext is established . . . when the compared jurors have expressed 'a substantially similar *combination* of responses,' in all material respects, to the jurors excused. (*People v. DeHoyos* [(2013) 57 Cal.4th 79, 107], italics added.)" (Maj. opn., *ante*, at p. 37.) This statement appears in tension with how the United States Supreme Court has conducted comparative juror analysis in three significant cases. (See *Foster v. Chatman* (2016) 578 U.S. __, __–__ [136 S.Ct. 1737, 1750–1754]; *Snyder v. Louisiana* (2008) 552 U.S. 472, 483–484; *Miller-El v. Dretke* (2005) 545 U.S. 231, 241–249.) In all three cases, the prosecutor gave more than one reason for each contested strike, and the high court, even when conducting comparative juror analysis for the first time on appeal, drew inferences of discrimination by comparing struck and seated jurors with respect to one or more of the stated reasons *considered individually*. The high court has not required " 'a substantially similar *combination* of responses,' in all material respects" (maj. opn., *ante*, at p. 37), in order to find comparisons between excused and seated jurors on a particular characteristic to be probative of discrimination. Indeed, the dissent in *Miller-El* argued that " ' "[s]imilarly situated" does not mean matching any one of several reasons the prosecution gave for striking a potential juror — it means matching *all* of them' " (*Miller-El*, at p. 291 (dis. opn. of Thomas, J.)), but

the high court expressly rejected that view (*id.* at p. 247, fn. 6). On this point, as with earlier aspects of our case law on comparative juror analysis, our approach appears out of step with controlling authority and ripe for reconsideration. (Cf. *People v. Lenix* (2008) 44 Cal.4th 602, 622 [abandoning, in light of *Snyder* and *Miller-El*, our rule in *People v. Johnson* (2003) 30 Cal.4th 1302, 1324–1325, that a reviewing court should not conduct comparative juror analysis for the first time on appeal].)

Second, today's opinion includes dicta restating that a trial court, in ruling on a *Batson* motion, may "take into account 'the court's own experiences as a lawyer and bench officer in the community, and even the common practices of the advocate and the office that employs him or her. (See *Wheeler*, *supra*, 22 Cal.3d at p. 281.)' " (Maj. opn., *ante*, at p. 26.) To the extent this statement authorizes trial judges to rely on personal knowledge of the prosecutor or experience with the prosecutor's office, I believe it may go too far. We have almost never relied on such a basis for upholding a trial court's *Batson* ruling (one minor exception is *People v. DeHoyos*, *supra*, 57 Cal.4th 79, 115), and there is good reason not to do so.

*Adkins v. Warden* (11th Cir. 2013) 710 F.3d 1241 (*Adkins*) is instructive. The prosecutor in that case said he struck a black juror because the juror was a single man. A few weeks later, the trial court discovered the juror was married. The prosecutor submitted an affidavit explaining that he did not learn until " 'long after the trial and upon reading the transcript' " that the juror was actually married. (*Id.* at p. 1245.) The trial court relied on its "own personal experience with the prosecutor in other cases" to conclude that this explanation was credible: "This Court having worked with District Attorney Davis on many other cases in the past, finds that he has never intentionally misrepresented any fact to this Court to gain an advantage in a criminal proceeding. He has many times admitted facts which

2

were to the detriment of his cases and accepted the consequences of facts that were against his case. This Court has never found District Attorney Davis to purposefully exclude blacks from juries in cases prosecuted by him. The Court finds his statement as to mistaken belief as to the marital status of jury [sic] Morris to be credible." (*Id.* at p. 1246 & fn. 3.)

The Eleventh Circuit rejected this approach. In addition to finding that the trial court erred in relying on the prosecutor's declaration because the defendant had no opportunity to rebut it, the appellate court disapproved of the trial court's "reli[ance] . . . on non-record evidence which Mr. Adkins did not have an opportunity to rebut, such as the trial court's personal experience with and opinion about the reputation of the prosecutor." (*Adkins*, *supra*, 710 F.3d at p. 1254.) "[T]here was no evidence presented during the *Batson* hearing about the prosecutor's reputation, other than assertions of good faith by the prosecutor. Neither was there evidence of the prosecutor's use of peremptory strikes against blacks in other criminal proceedings. It was therefore not reasonable for the trial court to interject non-record facts into its *Batson* analysis. Importantly, as with the prosecutor's affidavit itself, Mr. Adkins did not have notice or an opportunity to be heard on these matters." (*Id.* at p. 1254, fn. 11.)

The Seventh Circuit has similarly rejected a trial court's reliance on such personal knowledge. (See *Coulter v. McCann* (7th Cir. 2007) 484 F.3d 459, 465 ["The *Miller-El* [*v. Dretke*, *supra*, 545 U.S. 231] Court also had before it evidence that the local prosecutor's office had used a particular process to manipulate the racial composition of the jury in the past. [Citation.] This is different, we note, from a judge's personal testimonial to the character of the state's attorney in a particular case, which seems to be what happened here. At no point in *Batson*, *Miller-El* [*v. Cockrell* (2003) 537 U.S. 322], or *Miller-El* [*v. Dretke*] did the Court endorse anything like this. We realize that judges need to make credibility

3

determinations, but it is very troubling to base such decisions on personal relationships outside of the courtroom."].)

Winbush does not question our precedent on the two points above, and they do not figure into our reasoning in this case. I therefore join today's opinion, with openness to reconsidering these aspects of our *Batson* jurisprudence in a future case.


**L<small>IU</small>, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Winbush

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S117489
**Date Filed:** January 26, 2017

_____

**Court:** Superior
**County:** Alameda
**Judge:** Jeffrey W. Horner

_____

**Counsel:**

Richard Jay Moller, under appointment by the Supreme Court, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette and Gerald A. Engler, Chief Assistant Attorneys General, Ronald S. Matthias, Assistant Attorney General, Glenn R. Pruden, Alice B. Lustre and Karen Z. Bovarnick, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Richard Jay Moller
So'Hum Law Center of Richard Jay Moller
P.O. Box 1669
Redway, CA  95560-1669
(707) 923-9199

Karen Z. Bovarnick
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
(415) 703-5550